# EXHIBIT 2

HIGHLY CONFIDENTIAL

Page 1

```
           UNITED STATES DISTRICT COURT
                DISTRICT OF VERMONT
             CASE NO. 2:21-cv-00053


ROBERT WOLFE and CROSSFIELD,
INC.,

       Plaintiffs,

   -vs-


ENOCHIAN BIOSCIENCES, INC., et
al,
       Defendants.
   _____/



         VIDEOTAPED AUDIO-VISUAL DEPOSITION OF
                      LUISA PUCHE
                 *HIGHLY CONFIDENTIAL*




              Wednesday, June 15, 2022
                10:09 a.m. - 1:37 p.m.



                      Luisa Puche
             Miami-Dade County, Florida



              Stenographically Reported By:
                  Aurora C. Sloan, FPR
```

1   half or so, where I slowly reentered the workforce,
2   again as a consultant doing the same thing that I
3   did last time, until this current role.
4           Q.   Do you hold any professional licenses
5   or a CPA or anything like that?
6           A.   I took the exam, but unfortunately, in
7   Florida, it's 150 credits, and I was a late bloomer
8   and had children and worked, just never got to do
9   that extra education, but I did take the exam and
10  passed it.
11          Q.   And Ms. Puche, what's your current
12  role at Enochian?
13          A.   Chief --
14          Q.   Or let me clarify.  Enochian
15  BioSciences, the U.S. company.
16          A.   Chief financial officer.
17          Q.   Do you have any current role for
18  Enochian ApS, which I refer to as the Danish
19  company?
20          A.   No.  Other than I consolidate -- I
21  gather the information and consolidate it for our
22  public filings.
23          Q.   And Enochian ApS is a subsidiary, so
24  they are grouped in with the filings for Enochian
25  BioSciences?

HIGHLY CONFIDENTIAL

Page 13

1          A.    Yes.
2          Q.    Does Enochian ApS have a separate CFO
3     or is that your role as well?
4          A.    I am not the CFO of ApS.
5          Q.    Do they have a separate one?
6          A.    They have a CEO.  There really is no
7     reason to have a CFO.  It doesn't have any
8     activity, really, to be quite frank with you.  Very
9     minimal administrative costs.
10         Q.    Ms. Puche, I'm going to attempt to do
11    a document share here through Exhibit Share.  So
12    bear with me.  I think it takes one second to --
13         A.    Okay.
14         Q.    -- do it correctly.
15               (Thereupon, Plaintiff Exhibit 1, 2019
16         Luisa Puche Compensation Breakdown, was
17         marked for Identification.)
18               MR. MCCABE:  Okay.  So if I did it
19         right, everyone has access to what's been
20         marked as Plaintiff's Exhibit 1.
21               Did that come through for everybody?
22               THE WITNESS:  I don't see anything on
23         the screen.
24               THE COURT STENOGRAPHER:  You have to
25         refresh.

HIGHLY CONFIDENTIAL

Page 33

1  BY MR. MCCABE:
2       Q.  So -- I --
3       A.  I don't understand the question.  You
4  have to rephrase.
5       Q.  Okay.  Yeah.
6       MR. VALENTE:  Yeah.
7  BY MR. MCCABE:
8       Q.  I'll rephrase the question.
9       Do you know the last time that Serhat
10 had private security that was paid by Enochian
11 BioSciences?
12      A.  May of this year.
13      Q.  So until he was arrested?
14      MR. VALENTE:  Objection.
15      You can answer that question.
16      A.  Yes.
17 BY MR. MCCABE:
18      Q.  What was the last full month invoice
19 for for Serhat's security?
20      MR. VALENTE:  Objection, form.
21      To the extent you can answer that.
22      A.  45,000.
23 BY MR. MCCABE:
24      Q.  Was that within the range that you
25 typically observed?

Page 63

1      employee.
2             Q.   So as the only corporate
3      representative, it fell on you to sign the verified
4      complaint?
5             A.   Correct.
6             Q.   Did you have any discussion with the
7      board about why they were filing the complaint?
8                  MR. VALENTE:  Objection as to form,
9             but go ahead if you recall.
10            A.   Didn't have a direct conversation with
11     the board.  I was just told of the decision.
12     BY MR. MCCABE:
13            Q.   Did you do any sort of investigation
14     or have conversations about what was in the
15     verified complaint and the allegations against
16     Mr. Wolfe?
17                 MR. VALENTE:  Objection, form.
18            A.   I spoke to the people that I needed to
19     speak to.  And to the extent that there may have
20     been something, I don't remember everything that is
21     in that verified claim, so I'd have to see it.
22     But, you know, I did do some due diligence to be
23     able to sign off as it being reasonable.
24     BY MR. MCCABE:
25            Q.   Who did you speak to?  You said you

Page 64

1    spoke to people.
2         A.   I spoke to, at the time, Evelyn D'An,
3    which was on a committee chair, Mark Dybul.  I may
4    have -- I'm not sure if I spoke -- legal counsel.
5         Q.   When you spoke to either Evelyn or
6    Mark, were you trying to gather more information or
7    why were you speaking to them?
8              MR. VALENTE:  Objection, form.
9         A.   Part of it is because I didn't know --
10   you know, a lot of things happened prior to my
11   being here, so I didn't have personal knowledge.
12             Oh, it's -- sorry.  We're having
13   technical difficulties.
14   BY MR. MCCABE:
15        Q.   Goes around.
16             Do you have any concerns with what the
17   allegations of Bob -- against Bob and Crossfield
18   were?
19             MR. VALENTE:  Objection, form.
20        A.   I'm not sure I understand the
21   question.
22   BY MR. MCCABE:
23        Q.   Were you confident that the
24   allegations were accurate?
25        A.   I felt they were reasonable.

Page 107

1    D&O insurance paid for his legal bills, but I can't
2    tell you off the top of my head what that number
3    is.
4         Q.   Do you have access to that
5    information?
6         A.   I believe we could get it, but I don't
7    have it readily available.
8         Q.   Do you have any information about
9    what's happening with the Danish litigation
10   currently?
11              MR. VALENTE:  Objection, form.
12        A.   I'm not involved.  I know high level
13   what it's about, but I am not in the day-to-day
14   movement of that case.
15   BY MR. MCCABE:
16        Q.   Have you ever been asked to be a
17   representative or a witness in that case the way
18   you were for the state court?
19        A.   No.
20        Q.   Broadly speaking, are you aware of
21   anybody at Enochian who has any ill-will towards
22   Bob Wolfe or Crossfield?
23        A.   I can't speak for other people's
24   opinion, but -- people's feelings, but I have never
25   -- to be quite honest with you, he's never

Page 108

1  discussed in our organization.  So I believe that
2  no one has any ill-will towards him, as I perceive
3  it.
4          MR. MCCABE:  Okay.  I think that's all
5      the questions I have for you, Ms. Puche.
6          I assume your attorneys could ask you
7      questions, but I doubt they will.
8          MR. VALENTE:  Give me -- Mr. McCabe,
9      if you can give me --
10         MR. MCCABE:  You want to do a comfort
11     break?
12         MR. VALENTE:  I don't know, maybe,
13     like, 10 minutes and we'll reconvene and
14     we'll see if I have anything?
15         MR. MCCABE:  Sure.
16         MR. VALENTE:  Great.
17         MR. MCCABE:  Thank you.
18         THE VIDEOGRAPHER:  We're going off the
19     record at 1:18.
20         (Whereupon, a short break was taken
21     and, upon reconvening, the following
22     proceedings were had:)
23         THE VIDEOGRAPHER:  We are back on the
24     record at 1:32.
25              CROSS EXAMINATION

1      BY MR. VALENTE:
2              Q.   All right.  So I have just a few
3      questions.  And Ms. Puche, we'll start with
4      something we talked about this morning.
5                   You recall we talked about the
6      verified complaint on behalf of the Enochian
7      entities that you signed in the Vermont action.
8                   Do you recall that?
9              A.   Yes.
10             Q.   And I believe Mr. McCabe asked you
11     about the accuracy of the verified complaint.
12                  Do you remember that line of
13     questions?
14             A.   Yes.
15             Q.   And I believe one of your answers
16     discussed reasonableness.
17                  Can you explain what you meant by
18     reasonableness?
19             A.   What I was trying to say is that I
20     performed what I felt was a reasonable amount of
21     effort to be able to determine that these were
22     accurate statements at the time.
23             Q.   Can you describe some of that effort?
24             A.   Yeah.  Discussions with the folks that
25     I mentioned before.  I looked at the exhibits, and

Page 110

1    I read the verified complaint.
2             Q.   And do you believe that all of the
3    statements in the complaint were true and accurate
4    as of the date you signed it?
5             A.   As of the date I signed it, I did.
6             Q.   One other followup question.  It
7    relates to a question Mr. McCabe asked you much
8    more recently.
9             Mr. McCabe asked you about insurance
10   payments to Mr. Wolfe, and specifically, I believe
11   he asked you if you had access to documents or
12   information relating to those payments.
13            Could you clarify, does Enochian have
14   access to the documents and information from the
15   insurance company related to Mr. Wolfe's claim?
16            A.   No.  I thought he was talking about
17   the amount.
18            We actually asked, but they said that
19   it was privileged, and we could not have access to
20   it.  They just told us what they paid out.
21            MR. VALENTE:  Okay.  That's all I have
22       for the witness.
23            THE VIDEOGRAPHER:  You are muted, sir.
24            MR. MCCABE:  Is that better?
25            THE VIDEOGRAPHER:  Yes.

*Robert Wolfe and Crossfield, Inc. v. Enochian BioSciences, Inc. et al.*,
Civil Action No. 2:21-cv-00053-cr (D. Vt.)

**WITNESS:** Luisa Puche
**DATE OF DEPOSITION:** June 15, 2022

### DEPOSITION ERRATA SHEET

| Page No.: | Line No.: | Change or Correction and Reason: |
|---|---|---|
| 16 | 5 | Change "approximate" to "approximately" (Correction) |
| 29 | 8-9 | Change "He'd participate in that team." to "He would have participated in the board meeting as part of the scientific team." (Clarification) |
| 31 | 7 | Change "bodyguard" to "a bodyguard" (Correction) |
| 32 | 19 | Change "he" to "Enochian BioSciences" (Clarification) |
| 34 | 19 | Change "Vendor." to "The vendor." (Clarification) |
| 46 | 25 | Change "Today -- and" to "And" (Clarification) |
| 47 | 11 | Change "license" to "science" (Clarification) |
| 63 | 10 | Change "Didn't" to "I didn't" (Correction) |
| 63 | 21 | Change "claim" to "complaint" (Clarification) |
| 64 | 3 | Change "which" to "who" (Correction) |
| 64 | 3 | Change "on a" to "audit" (Correction) |
| 75 | 10-11 | Change "but as an exhibit, I did see that there was action to seal it" to "but from what I recall, I believe there was action to seal it" (Clarification) |
| 76 | 24 | Change "I did" to "that was my understanding (Clarification) |
| 82 | 7 | Change "probably not." to "probably not but it would depend on the circumstances." (Clarification) |
| 84 | 20 | Change "in" to "on" (Correction) |
| 104 | 11 | Change "No, don't understand" to "No, I don't understand." (Correction) |
| 106 | 4 | Change "his" to "Mr. Gumrukcu's" (Clarification) |

SIGNATURE: *Luisa Puche* (DocuSigned by, CD2124829EBF416...)
LUISA PUCHE

DATE: 7/19/2022