# EXHIBIT 4

CONFIDENTIAL

Page 1

1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF VERMONT
2

       ROBERT WOLFE and CROSSFIELD, INC.,   )
3                        Plaintiffs,        )  Case No.
                  vs.                       )  2:21-cv-00053
4      ENOCHIAN BIOSCIENCES INC., et al.,   )
                         Defendants.        )
5
6                           CONFIDENTIAL
7                    Deposition of Robert Wolfe
                      held via videoconference
8                        on June 21, 2022
                      beginning at 10 a.m.
9
10

       A P P E A R A N C E S
11

       For the Plaintiffs
12

       ADLER & McCABE
13          P.O. Box 189
            St. Johnsbury, VT   05819
14     BY: DANIEL D. McCABE, ESQUIRE
       dmccabe@adlerandmccabe.com
15

       For the Defendants
16

       K&L GATES LLP
17          State Street Financial Center
            One Lincoln Street
18          Boston, MA   02111
       BY: MICHAEL R. CRETA, ESQUIRE
19          CHRISTOPHER J. VALENTE, ESQUIRE
20          ANNA L'HOMMEDIEU, ESQUIRE
21     Michael.creta@klgates.com
22
23     Also present:  Luisa Puche
24
25     Videographer:  Joe Raguso

CONFIDENTIAL

Page 11

1    yourself personally, and also for Crossfield as its

2    corporate representative.  Do you understand that?

3         A.    I do.

4         Q.    Unless you say otherwise, I'm going to assume

5    that your answers are on behalf of both yourself

6    individually and also on behalf of Crossfield.  Do you

7    understand that?

8         A.    I do.

9         Q.    So now just to confirm a few things.  You are

10   a corporate officer of Crossfield; right?

11        A.    I am.

12        Q.    What is your title at Crossfield?

13        A.    Chairman and CEO.

14        Q.    Are you Crossfield's sole shareholder?

15        A.    I am.

16        Q.    Did you prepare for this deposition today?

17        A.    I did.

18        Q.    What did you do to prepare?

19        A.    I met with counsel.  And I reviewed the

20   filings.  And I tried to see if I had any materials that I

21   may have forgotten about in reference to this case.

22        Q.    Besides meeting with -- well how many times

23   did you meet with your counsel?

24        A.    With Dan McCabe I've met for preparation of

25   this deposition once.

CONFIDENTIAL

Page 32

1    revenues.  Its subsidiary Anton Neilsen Vojens has

2    received revenues.

3         Q.     You know what Advanced Oxygen Technologies

4    stock is currently trading at?

5         A.     I believe this morning it was 20 cents.

6         Q.     It's a penny stock, is that fair?

7         A.     Yes.

8         Q.     All right.  Let's circle back to -- well one

9    follow-up question.

10              Has Advanced Oxygen stock been trading about

11   that level, you know, for the recent past?

12        A.     The market's -- it's been trading between 15

13   cents and 88 cents.  There is very little trading in it.

14        Q.     Let's move on to Crossfields.  Are you the

15   founder of Crossfield?

16        A.     I am.

17        Q.     When was Crossfield founded?

18        A.     1989.

19        Q.     I'm sorry.  What year was that?

20        A.     1989.

21        Q.     I think your Resume mentioned 1985.  Could it

22   be 1985?

23        A.     Well I was using -- I have to look.  I was

24   operating in business as Crossfield in 1985.  I don't know

25   if -- I think that the formal organization of the company

CONFIDENTIAL

Page 33

1    was 1989.  I have to look.

2         Q.    So you think you founded the company in 1989,

3    but you might have been using the Crossfield name earlier.

4    Is that -- is that accurate?

5         A.    I was.  That is accurate.

6         Q.    And generally speaking, what does Crossfield

7    do?

8         A.    Financial consulting.  That's primarily what

9    it was.  Or what it is, I'm sorry.

10        Q.    When you say financial consulting, is it

11   really a vehicle for you personally to provide services to

12   other companies?

13        A.    Me, Robert Wolfe?

14        Q.    Yes.

15        A.    No.  No.

16        Q.    Are there -- how many employees does

17   Crossfield have?

18        A.    None.  Me.

19        Q.    Your Resume says that you have been President,

20   CEO and Director of Crossfield from 1985 to the present.

21   Do you see that?

22        A.    I do.

23        Q.    And then there is some sub bullet points

24   underneath it.  It says that from 1992 through 1996 the

25   operations of Crossfield, Inc. consist solely of capital

CONFIDENTIAL

**Page 41**



Designated CONFIDENTIAL per Protective Order (Dkt. No. 70)

CONFIDENTIAL

CONFIDENTIAL

Page 42



CONFIDENTIAL

Page 51

1      Q.      What were your responsibilities in that role?

2      A.      My responsibilities were to create processes

3   and controls over financial reporting, to report to

4   management and the board of directors, to control banking,

5   to create and report all the SEC filings, and control and

6   file fiduciary reports.  I'm sorry.  Fiscal reports.

7   Financial reports.

8      Q.      Anything else?

9      A.      No.

10     Q.      When did that first period of employment with

11  Enochian end?

12     A.      I believe it was April 2015.

13     Q.      I guess why did it end?  Why did your

14  employment end?

15     A.      We were successful with the reverse merger and

16  getting a company through that process to be public in the

17  United States.

18     Q.      When you were serving as a CFO, did you have

19  some other title?

20     A.      I was also director.

21     Q.      So you were serving as CFO and director?

22     A.      Yes.

23     Q.      When did your second period of employment with

24  Enochian begin?

25     A.      July 2017.

Page 52

1      Q.      During that second period you served as the

2   CFO of Enochian BioSciences; is that right?

3      A.      I was under contract with Enochian Denmark.

4   And employed by them and served as CFO of both companies.

5      Q.      Okay.

6      A.      We need to refer to the contract and the

7   language for the CFO, but I was CFO of Enochian

8   BioSciences.

9      Q.      Yeah.  I'm not getting into any contracts.  I

10  just want to know; you were serving as CFO of Enochian

11  BioSciences?

12     A.      I was.

13     Q.      And you were also serving as CFO of Enochian

14  Denmark; correct?

15     A.      I have to look.  But yes.

16     Q.      Why were you hired by Enochian for this second

17  period?

18     A.      It's my understanding from meeting with Rene

19  and Henrik prior to being employed that they wanted me to

20  come back on to successfully get the company to NASDAQ,

21  and that they had identified an acquisition target for the

22  company.

23             My duties were the same that I described to

24  you for DanDrit Biotech A/S with my first employment.

25     Q.      You used the word -- you say you have duties

CONFIDENTIAL

Page 53

1    to Enochian.  And so those duties were the same in your

2    second period as your first period.  Is that what I just

3    heard?

4         A.     Through Enochian Denmark and my employment

5    contract there.  Yeah.

6         Q.     I'm not talking about any employment contract

7    or any contract right now.  I'm just saying as to the CFO

8    for Enochian BioSciences and Enochian Denmark, you had

9    duties to both of those companies.  Is that fair?

10        A.     Yes.

11        Q.     Did your duties include protecting the two

12   companies' confidential information?

13        A.     No.

14        Q.     Why not?

15        A.     Because my contract is with Enochian Denmark,

16   and I had a duty in Enochian Denmark to protect certain

17   confidential information that's defined therein for the

18   contract.

19        Q.     Okay.  Setting aside the contract though, you

20   were the CFO of Enochian BioSciences; right?

21        A.     Yes.

22        Q.     Right.  And that was a publicly-traded

23   company?

24        A.     Yes.

25        Q.     As the CFO of a publicly-traded company you

1    Designated CONFIDENTIAL per Protective Order (Dkt. No. 70)



1     Q.     When you were serving as Enochian's CFO did

2   Enochian provide you with any confidential information?

3     A.     Enochian had -- when I was serving as CFO --

4   Enochian had no confidential information policies or

5   processes.  So there was no time at which Eric or the

6   board came -- provided information to me and stated that

7   it was confidential.  I summarily treated all the

8   financial information as confidential.

9     Q.     So you said that you treated all financial

10  information as confidential.  What financial information

11  would that include?

12    A.     I don't understand the question.

13    Q.     Let me rephrase actually.  So when you say all

14  financial information, that's financial information from

15  both Enochian BioSciences and Enochian Denmark; correct?

16    A.     Yes.

17    Q.     Besides financial information, what other

18  information for Enochian would you treat as confidential?

19    A.     For Enochian Denmark and via my contract, I

20  was obligated to treat customers, suppliers, marketing,

21  pricing, formulas, and that information as confidential.

22    Q.     All right.  Besides Enochian Denmark or

23  Enochian BioSciences, what information of Enochian

24  BioSciences did you treat as confidential?

25    A.     I treated all financial reports as

Page 59

1    confidential; third-party reports, financial reports.  I

2    treated, of course, all information that was privileged.

3    Had I received any of the IP -- or well there really were

4    no -- had I received any of the science or seen that I

5    would have treated that as confidential, presentations at

6    board meetings as confidential.

7         Q.     Would you treat the discussions that would

8    happen during board meetings, would that be confidential?

9         A.     Yes.

10        Q.     What about the different terms and conditions

11   of Enochian BioSciences' contracts with different vendors,

12   would that be confidential?

13        A.     If it's not required -- not always.  If it's

14   not required to be disclosed.  I disclosed in the SEC

15   filings either as exhibits or notes, contracts with

16   vendors and/or investors.

17        Q.     Okay.  Any other information besides what we

18   just talked about that you treated as confidential for

19   Enochian BioSciences?

20        A.     Yes.  HR.  The benefits.  I would have to

21   think more, but communications with the board.

22        Q.     Anything else?

23        A.     Not that I can recall.  I'll get back to you

24   if I can think of other things.

25        Q.     As the CFO of Enochian did you do anything to

CONFIDENTIAL

Page 60

1    protect Enochian's confidential information?

2         A.    I did not distribute it.  I did not -- we

3    ultimately set up a centralized server for information to

4    be secured there.  That was pretty much where we were.

5               I wasn't receiving a lot of confidential

6    information other than numbers and expenses.

7         Q.    Did you treat confidential information

8    belonging to Enochian BioSciences any differently than

9    confidential information belonging to Enochian Denmark?

10        A.    No.

11        Q.    Maybe 5 or 10 minutes ago you mentioned

12   implementing processes to protect confidential

13   information.  I know you just mentioned that server that

14   was set up.  Were other things done?

15        A.    For confidential information?

16        Q.    Right.  So what else were you involved in for

17   implementing processes to protect confidential

18   information?

19        A.    I wasn't.  I was involved in setting up

20   processes for implementing controls over financial

21   reporting of which I did for both companies.  But the

22   processes for controls for protection of IP, of

23   confidential information, et cetera, was not established

24   to my knowledge, and I didn't see that anyway.

25        Q.    While you were serving as Enochian's CFO,

CONFIDENTIAL

Page 72

1   Designated CONFIDENTIAL per Protective Order



CONFIDENTIAL

Page  73

1    Designated CONFIDENTIAL per Protective Order (Dkt. No. 70)



CONFIDENTIAL

**Page 74**

1        Q.        Designated CONFIDENTIAL per Protective Order (Dkt. No. 70)



CONFIDENTIAL



Designated CONFIDENTIAL per Protective Order (Dkt. No. 70)

1    Mr. Enochian's -- knew of Mr. -- sorry.  Mr. Gumrukcu's

2    past; his 14 felony violations, his felony conviction, his

3    warrant for arrest in Turkey for medical fraud I believe

4    is what it was called.  His treating patients without a

5    license.  His other wrongdoings that are now public.

6         Q.    What does all that that you just described

7    have to do with your termination?

8         A.    Well I think that if I discovered that, that I

9    would bring that to the attention of attorneys or the SEC

10   or whomever.  And that could, again, be problematic for

11   the company and be another reason for my termination.

12        Q.    You say if you discovered that.  Did you, in

13   fact, discover all those things prior to your termination?

14        A.    No.

15        Q.    I'm sorry.  I didn't --

16        A.    No is the answer.  I knew of none of them.

17   Except the rumor that he had bounced a check.

18        Q.    So apart from a rumor that he bounced a check,

19   all the other things you described over the last minute or

20   two you didn't know any of those things prior to your

21   termination?

22        A.    I did not.

23        Q.    So I mean -- let me just get this straight.

24   Are you suggesting that you believe these things are

25   relevant to your termination because you potentially could

CONFIDENTIAL

Page 89

1    have learned about them and then potentially could have

2    disclosed them and Enochian was fearful of that?  Is that

3    what you're suggesting?

4          A.    Well I'm suggesting that they either knew, and

5    I believe that people at Enochian did know, or knew of

6    some of it.  If I were to bring that forward to the board

7    or to Eric, that they would have fiduciary

8    responsibilities to deal with that, which would be a

9    reason for termination because that wouldn't be good for

10   them, for their shareholders, et cetera.

11         Q.    Why do you believe Enochian would be worried

12   about you learning and then disclosing this information?

13         A.    Because as an officer of the company and as a

14   board they would have a responsibility to address Mr.

15   Gumrukcu and possibly lose him.

16         Q.    Do you have any documents or evidence

17   reflecting or establishing any of the things that we have

18   been talking about over the last minute or two relating to

19   Mr. Gumrukcu?

20         A.    I have subsequently -- once I was terminated

21   and once the lawsuits began, I looked into Gumrukcu.  I

22   didn't find nearly what's in the press today.  But I did

23   find some items.

24               Do I have documents or knowledge that any

25   particular person in Enochian when I was there had this

1    knowledge other than the bounced check?  No.

2         Q.     You mentioned searches after.  So you

3    conducted searches, but they were after filing your Danish

4    complaint in the Danish action; is that accurate?

5         A.     I believe it was after or about -- around

6    those time.

7         Q.     Okay.  It was after you were terminated

8    though?

9         A.     It was after I was terminated.  It was either

10   in January or February of that year.

11        Q.     Okay.  And what type of search did you

12   conduct?

13        A.     Pacer and Google.

14        Q.     What did you search for on Pacer?

15        A.     Serhat Gumrukcu.

16        Q.     What did you find from that search?

17        A.     14 felony charges.

18        Q.     Those are felony charges that you weren't

19   aware of while you were at --

20        A.     I also found -- I can't remember the name of

21   the town.  I want to say it's Beaver County Pennsylvania

22   there was a lawsuit there.  And I didn't find anything

23   else, I don't think, from Pacer.

24              Google you could find things.

25        Q.     What did you search on Google?

CONFIDENTIAL

Page 92

1    I was unaware of real estate.  I was -- of course I was

2    completely unaware of the details until recently of his

3    alleged murder for hire.

4         Q.    When you say Turkey, what are you referring to

5    there?

6         A.    His magic, his Royal Highness, his bending

7    spoons.  I don't know.  I have to go through.

8         Q.    When you say real estate, what is that

9    referring to?

10        A.    There is a report in Hindenburg -- I'll just

11   call it Hindenburg report -- that the real estate that is

12   in California where they -- the report alleges Enochian

13   has moved its offices is owned by Serhat and his spouse.

14        Q.    While you were at Enochian did you ever raise

15   the issue of any criminal charges against Serhat with

16   anyone else at Enochian?

17        A.    No.

18        Q.    Did you sign a termination agreement with

19   Enochian BioSciences or Enochian Denmark?

20        A.    No.

21        Q.    Did you sign a separation agreement with

22   Enochian BioSciences or Enochian Denmark?

23        A.    No.

24        Q.    Do you believe that you, Crossfield and

25   Enochian reached an agreement on the terms of your

CONFIDENTIAL

Page 101

1    position has been filled, none of the companies provided

2    any other type of reason?

3         A.     Not that I recall.  No.

4         Q.     Have any, since your separation from Enochian,

5    have any employers explicitly told you that they would not

6    hire you?

7         A.     As I recall the only responses I got in that

8    manner was companies saying that the position has been

9    filled.

10        Q.     So you think it's fair to say that none of

11   these employers raised any of this litigation between you

12   and Enochian as a reason that you wouldn't be hired; is

13   that fair to say?

14        A.     They did not say.

15        Q.     Right.  I want to direct our attention to

16   these documents you have been referring to -- what I think

17   you've been referring to.  We are going to mark -- we are

18   going to add this to the exhibit share now.  And mark it

19   as Wolfe Exhibit 4.

20               So this is not in your binder.  It's just a

21   little too voluminous to include in there, so we are just

22   going to do it through screen share for this one.  Just

23   bear with us.  Might just take a second because it's such

24   a large file.

25               MR. McCABE:  Mike, do you care if I get

CONFIDENTIAL

Page 107

1    on whether the price of Enochian BioSciences' stock

2    increases or decreases?

3         A.     No.

4         Q.     Do you have any type of financial interest

5    related to Enochian BioSciences' stock?

6         A.     No.

7         Q.     Please turn to tab 4 in your binder which we

8    will mark and upload as the next exhibit.  Should be

9    Exhibit 4.

10                    (Exhibit 4 was introduced)

11   BY MR. CRETA:

12        Q.     What is this document?

13        A.     This is the -- my employment agreement.

14   That's the CFO service agreement.

15        Q.     So I'm just going to refer to this as the CFO

16   service agreement for the rest of the day.  If you could

17   turn to page 8.  Did you sign this page?

18        A.     I did.

19        Q.     If you could turn back to the first page.

20   This page states that you and Crossfield were being hired

21   to serve as the CFO of DanDrit Biotech A/S; correct?

22        A.     I'm sorry.  What was the question?

23        Q.     On the first page it states that you and

24   Crossfield were being hired to serve as the CFO of DanDrit

25   Biotech A/S; correct?



CONFIDENTIAL

Page 117

1      A.      Yes.

2      Q.      Why did you send a copy of the Danish

3  complaint to Chris Anderson and Chad Sadler?

4      A.      I sent a copy to Enochian BioSciences Denmark

5  ApS counsel first.  It was the week before.  To alert them

6  that I was going to file a lawsuit against them in court.

7              I did that.  And I sent this to the law firm

8  during the transition.  And in December I notified them as

9  I was required to do that I was terminated, and

10  subsequently notified them that there may be a dispute

11  with the company and myself.

12      Q.      My question's a little bit more narrow.  Why

13  did you send the Danish complaint to Chris Anderson and

14  Chad Sadler on February 7, 2019?

15      A.      They asked me to.  And I sent it to them to

16  have them see that the lawsuit exists.

17      Q.      When did they ask you to send it?  When did

18  they ask you to send this complaint to them?

19      A.      They asked me -- when I was CFO they asked me

20  that if I had a legal dispute with the company, to please

21  send it to them.

22      Q.      They specifically ask you to send this

23  complaint to them?

24      A.      They specifically asked if I had filed a

25  complaint legally, to please send it to them.

CONFIDENTIAL



CONFIDENTIAL



Page 122

1    Designated

Designated CONFIDENTIAL per Protective Order (Dkt. No. 70)

CONFIDENTIAL



Designated CONFIDENTIAL per Protective Order (Dkt. No. 70)

CONFIDENTIAL

Page 124

1    Designated

Designated CONFIDENTIAL per Protective Order (Dkt. No. 70)

CONFIDENTIAL

Page 125



CONFIDENTIAL

Page 126



CONFIDENTIAL

Page 131

1       A.      I'm sorry?

2       Q.      What else did you do?

3       A.      I researched the salaries of publicly-traded

4    company CFOs.  I calculated damages.  I calculated my time

5    for defending my reputation.  And I or we sought legal

6    experts for verification for this claim.

7       Q.      When you say you sought legal experts for

8    verifying the claim, what does that mean?

9       A.      We sought to find and engage legal experts for

10   this case.

11      Q.      When you say legal experts, are you talking

12   about your counsel?

13      A.      I'm talking about legal experts that can opine

14   and testify as to the veracity of the damages.

15      Q.      Have you engaged any of those experts?

16      A.      I don't believe so.

17      Q.      Did you have discussions with any?

18      A.      Yes.

19      Q.      Who are they?

20      A.      I didn't have the discussions.  My counsel had

21   the discussions.

22      Q.      And who were those -- who were the discussions

23   with?

24      A.      I am not certain of all of them.  I believe

25   one was BDO.

Page 142

1    9/30 and 12/31/2018.

2        Q.      Anywhere else?

3        A.      I recall, or to my recollection, it was in the

4    press.  I don't have a place to direct you to tell you

5    where that is.

6        Q.      As we talked about before, you can't remember

7    any specific publications or articles?

8        A.      I can't.  I may or may not have the press -- I

9    don't think that I do.  I think it was on the -- I may or

10   may not have some press clips.  I can look.

11                       MR. CRETA:  I think this might be a

12           good time to take a 5-minute break or so.  We will

13           come back right around 3:20ish.

14                       THE WITNESS:  Okay.

15                       THE VIDEOGRAPHER:  We are off the

16           record.  The time is 3:13.

17                       (Recess was taken.)

18                       THE VIDEOGRAPHER:  If all parties are

19           ready, please stand by.  We are now on the record.

20           The time is 3:24.

21   BY MR. CRETA:

22        Q.      Mr. Wolfe, we were looking at your Amended

23   Verified Complaint before the break.  I just want to turn

24   back to one of the allegations we had looked at which was

25   paragraph 25.  It says:  Plaintiffs believe that

CONFIDENTIAL

                                                    Page 143

1    Defendants' motives for the Vermont litigation were to

2    leverage Plaintiff financially, exhaust Plaintiffs'

3    financial resources, and influence the Danish

4    negotiations.

5              Do you see that one?

6        A.    I do.

7        Q.    Do you have any emails from Enochian where

8    they concede that that was their motivation for filing the

9    lawsuit?

10       A.    Can you repeat the question?

11       Q.    Do you have any emails from Enochian where

12   they concede that that was the purpose for filing the

13   lawsuit?

14       A.    No.  I have the negotiation emails, and I have

15   the emails between attorneys.  I don't believe that they

16   concede that.

17       Q.    Do you have any documents or evidence where

18   Enochian admits or concedes this?

19       A.    I have communications with Eric Leire and Ole

20   Abildgaard that both have said it independently, that the

21   lawsuit will bankrupt me.

22       Q.    That's a little bit different than this

23   though.  Even if that is the case, this is saying that

24   Defendants' motives were to leverage Plaintiffs

25   financially, exhaust Plaintiffs' financial resources, and

CONFIDENTIAL

Page 144

1    influence the Danish negotiation.

2              Specifically tied to Defendants' motives.  So

3    is there any document, email or anything else you have,

4    that concedes that these were the motives of Enochian?

5         A.    That they concede, no.  But like I said, I

6    have had those conversations where Eric, Ole have

7    indicated, said that these lawsuits will exhaust, to use

8    your words, not their words, my financial resources.

9    Their words were bankrupt me, Robert Wolfe.

10        Q.    Did Eric ever tell you that Enochian's motive

11   for the superior court action was to leverage Plaintiffs

12   financially?

13        A.    He didn't use those words, but he said they

14   are trying to bankrupt me.

15        Q.    Okay.  So Eric specifically said that Enochian

16   was intentionally trying to bankrupt you?  Is that what

17   you're saying?

18        A.    Yes.

19        Q.    When did Eric say that?

20        A.    He didn't use the words intentional.

21        Q.    Did Eric say that Enochian was trying to

22   bankrupt you?

23        A.    Yeah.  As I recall.

24        Q.    All right.  When did Eric say that Enochian

25   was trying to bankrupt you?

CONFIDENTIAL

Page 145

1    A.    I would say, if I recall correctly, March or
2    April of 2019.
3        Q.    Is there any documents or -- is there any
4    documents reflecting that conversation?  Was that on the
5    phone?
6        A.    It was definitely on the phone.  I may have
7    some emails about it.  I don't know.
8        Q.    You don't recall any today?
9        A.    I don't recall any today.
10       Q.    Turn to paragraph 40 of the Amended Verified
11   Complaint.  You state:  That the action against Plaintiffs
12   was brought with malice.
13               Do you see that?
14       A.    I do.
15       Q.    What is the basis for this statement?
16       A.    I believe they specifically brought the action
17   in Vermont, and this is malicious prosecution.  With
18   malice for several reasons.  One, they wanted to influence
19   financially me.  Secondly, they wanted to ruin my
20   reputation and my ability to be CFO for publicly-traded
21   companies.
22               I believe that that's evidenced again in the
23   Stiig Waever report.  I believe that that report was
24   called a forensic report whereby that report in itself
25   states that I should never be a CFO.  It states, among

CONFIDENTIAL

Page 146

1    other things, very bad, misleading, incorrect items.  And

2    that was commissioned, as I understand, from the

3    Defendants.

4         Q.    Did Enochian -- are you aware of Enochian ever

5    saying that it was trying to harm your professional

6    reputation?

7         A.    I'm not aware of that.  That's what they did.

8         Q.    That's just your belief though; correct?

9         A.    I believe that the forensic report exists, so

10   --

11        Q.    But no one from Enochian ever told you that

12   they were trying to harm your reputation; right?

13        A.    No one told me.

14        Q.    Are you aware of anyone ever -- anyone from

15   Enochian ever saying that Enochian was trying to harm your

16   reputation?

17        A.    No.

18        Q.    Do you have any documents stating that

19   Enochian was intentionally trying to harm your reputation?

20        A.    I may have emails about discussions of it.  I

21   don't recall a specific one.

22        Q.    So you don't recall any specific documents?

23        A.    No.  I recall specific discussions from Ole

24   Abildgaard that you'll never work as a CFO again.

25        Q.    When did those discussions take place?

1      Q.      Sorry.  Why were you meeting?

2      A.      I don't recall.  I think a discussion on a

3   possible -- I don't recall if we were discussing a

4   different deal that my attorney and Ole actually were

5   involved in.

6      Q.      Is Ole an officer of Enochian?

7      A.      No.

8      Q.      Has he ever been?

9      A.      No.

10      Q.      Is Ole on the --

11      A.      To my knowledge.

12      Q.      -- to your knowledge.  Is Ole on Enochian's

13   Board of Directors?

14      A.      To my knowledge, he has never been.  Or I'll

15   restate that.  During the time that I was with Enochian,

16   no.

17      Q.      What is Ole's connection to Enochian?

18      A.      He's part of the billionaires' club.

19      Q.      Meaning what?  He's an investor of Enochian?

20      A.      He has been an investor of Enochian.  In

21   Denmark there is a group of rich individuals that have

22   been labeled by the press and others as part of the

23   billionaires' club.

24      Q.      That has nothing to do with Enochian; right?

25      A.      No.  But Rene is friends with him, and they

CONFIDENTIAL

Page 158

1   Designat

Designated CONFIDENTIAL per Protective Order (Dkt. No. 70)



1        Q.      When was the last time that Crossfield itself
2   earned revenue for itself of over 1 million dollars in a
3   year?  Has that ever happened?
4        A.      Yes.  And but that was in the '80s.
5        Q.      Okay.  So for the last 30 something -- 30 plus
6   years, Crossfield has never had more than 1 million
7   dollars in revenue in a single year.
8        A.      In revenue.  That's correct.
9        Q.      Okay.  And why did you use 15 years for this
10  calculation of Crossfield revenue?
11       A.      It's the same parameter that I used for the
12  salary.
13       Q.      So is it your position that the Defendant
14  should pay Crossfield 16.5 million dollars on top of
15  approximately 25 million to you personally?
16       A.      Yes.
17       Q.      When you were working at Enochian, Enochian
18  wasn't paying both you and then separately Crossfield;
19  right?
20       A.      Correct.
21       Q.      Who was Enochian paying?  Was it you, or was
22  it Crossfield?
23       A.      Me.
24       Q.      Okay.
25       A.      I should correct that.  It was me, and I

1    directed it -- the payment to one of my companies.

2          Q.     Okay.  But only received one paycheck; right?

3    And that paycheck went to you?

4          A.     That's correct.

5          Q.     And that paycheck went to you?

6          A.     That's correct.

7          Q.     Why would you be entitled to 16.5 million for

8    Crossfield on top of, you know, 25 million to you

9    personally if Enochian had never paid both you and

10   Crossfield?

11         A.     Crossfield has been -- the results of this

12   action have affected Crossfield's reputation and the

13   ability to do business.

14         Q.     Have any clients of Crossfield specifically

15   told Crossfield that they will not do business with it

16   because of any of this litigation?

17         A.     No.

18         Q.     So you have no direct evidence of actually

19   losing any business for Crossfield related to this

20   litigation?

21         A.     Direct action would be Ole Abildgaard.

22         Q.     Okay.  But you don't have any -- you can't

23   point to any specific client of Crossfield and say, yes,

24   we lost that client because of this litigation; correct?

25         A.     Other than him, no.

CONFIDENTIAL

Page 206



Designated CONFIDENTIAL per Protective Order (Dkt. No. 70)

CONFIDENTIAL

Page 207



Designated CONFIDENTIAL per Protective Order (Dkt. No. 70)

CONFIDENTIAL

Page 208

1            MR. CRETA:  All right.  So you're

2       taking a position that the -- just the amount that

3       has been billed in fees is privileged information?

4            MR. McCABE:  Taking the position that a

5       fee between a client and myself is privileged.

6            MR. CRETA:  Okay.  And it's your

7       position we are not entitled to any information on

8       this until the end of the case?

9            MR. McCABE:  Correct.

10   BY MR. CRETA:

11       Q.    Mr. Wolfe, do you have a contingency fee

12   arrangement with your counsel?

13            MR. McCABE:  Objection.

14   BY MR. CRETA:

15       Q.    Do you pay hourly legal fees?

16            MR. McCABE:  Objection.

17            MR. CRETA:  Dan, is it your position

18       that we are not entitled to this information in

19       connection with preparing any expert reports?

20            MR. McCABE:  Yes.  At this point.

21            MR. CRETA:  All right.  Well we don't

22       think that objection is appropriate.  We reserve the

23       right to, you know, keep this deposition open and

24       come back to these questions.

25   BY MR. CRETA:

CONFIDENTIAL

1        Q.      When you left Enochian at the time of

2    termination, were they a pre-revenue company?

3        A.      They had no revenues.

4        Q.      Are they a pre-revenue company now?

5        A.      Last reports I saw I saw that they had no

6    revenues.

7        Q.      Did they ever have any revenues while you were

8    a CFO of Enochian?

9        A.      In Denmark in the first round.  Yes.

10       Q.      Not talking about any debt or investments;

11   investments, equity investments.  Did they actually have

12   any revenues from products that were being sold?

13       A.      They had revenues from -- yes.  Not from

14   products that they sold.  They had revenues.

15       Q.      What were the revenues from?

16       A.      The revenues were from the Danish government

17   for research and development.

18       Q.      Is that like a grant?

19       A.      The specific statute in which they pay for

20   research and development in Denmark, I don't know.

21       Q.      How much was that for?

22       A.      If I recall correctly, 350,000 or so.  Around

23   350,000 U.S. dollars.

24       Q.      All right.  So apart from that, can you

25   remember any other revenues that Enochian had during your

CONFIDENTIAL

Page 215

1    tenure as CFO?

2         A.     No.

3         Q.     During your tenure at Enochian did Enochian

4    have losses each quarter?

5         A.     Yes.

6         Q.     Is Enochian a pre-clinical company?

7         A.     I don't know.

8         Q.     Does it have any products that it currently

9    commercializes?

10        A.     That it commercializes?  Not that I know of.

11        Q.     When you were CFO did Enochian sell any

12   products?

13        A.     Not that I know of.

14        Q.     Did Enochian have any products that were

15   clinically approved?

16        A.     I don't know what that means.  Enochian had

17   patented technology.

18        Q.     I guess I don't understand.  Why are you using

19   this BDO report that's about companies that have over a

20   hundred million dollars in revenue when Enochian doesn't

21   have any revenue?  It seems like apples and oranges to me.

22   So help me understand.

23        A.     Well you're using one criteria of the

24   determination of salaries based on one criteria of the

25   valuation of the company.

CONFIDENTIAL

Page 220

1    BY MR. CRETA:

2         Q.      What is this document?

3         A.      This is an affidavit of Robert E. Wolfe for

4    the superior court in Orange.

5         Q.      This is an affidavit that you provided?

6         A.      It is.

7         Q.      Please turn to page 11.  Is that your

8    signature?

9         A.      It is.

10        Q.      Did you sign the affidavit under oath?

11        A.      I don't know the answer to that question.

12        Q.      If you look underneath --

13        A.      It was notarized.  I'm sorry.

14        Q.      You look in the block for the notary it says:

15   Made oath that the foregoing instrument subscribed by him

16   is true.

17               Did you sign this under oath?

18        A.      Oh, yes.

19        Q.      Who drafted the affidavit?

20        A.      My attorneys.

21        Q.      So the first draft of this was prepared by

22   your legal counsel; is that correct?

23        A.      I believe so.  Yes.

24        Q.      Did you make any edits to it?

25        A.      I don't recall.

CONFIDENTIAL

Page 255

1          A.      I don't know.

2          Q.      So sitting here today can you think of

3      anything in writing that confirms that that report was

4      commissioned by Rene or Enochian?

5          A.      Can I think of anything?  Is that your

6      question?

7          Q.      Yes.  Can you recall anything right now in

8      writing that confirms that the report was commissioned by

9      Rene or Enochian?

10         A.      I can't recall right now.

11         Q.      Do you know if Enochian paid for the report?

12         A.      I don't know.

13         Q.      Okay.  So it's possible that Ole commissioned

14     and paid for this report.  Is that fair?

15         A.      I don't think that's fair.  I don't know the

16     answer.  I was told that Rene commissioned the report.

17         Q.      That's just secondhand knowledge; correct?

18         A.      That's correct.

19         Q.      Do you have any evidence that Enochian sent

20     the report to anyone?

21         A.      I have evidence that it's been distributed in

22     the public.  I don't know how Ole got it.  But I assume he

23     got it from Enochian or Rene.

24         Q.      Besides assuming that Ole received this report

25     from Enochian or Rene, do you have any evidence that

Page 256

1    Enochian sent the report to anyone?

2         A.     I don't.  I don't think I do.

3         Q.     All right.  Are you aware of anyone else who

4    has a copy of the report?

5         A.     Yes.

6         Q.     Who?

7         A.     My attorney.  Ole Abildgaard.  And I believe

8    that Rene has it.

9         Q.     Anyone else?

10        A.     I don't recall that Eric has it.  And I don't

11   recall ever speaking to him about it.  So I don't know

12   with him.

13        Q.     Okay.  This report it's part of -- part of

14   your lost future earnings was caused by the distribution

15   of this report; is that right?

16        A.     Amongst other things.

17        Q.     This report was created after the superior

18   court action was initiated, correct?

19        A.     I believe it was.

20        Q.     So this report has nothing to do with your

21   allegations of malicious prosecution; correct?

22        A.     I think it continues to show that the

23   Defendants had malice.

24        Q.     Are you saying that part of your damages

25   resulted from the filing of the superior court action, and

CONFIDENTIAL



Page 262

1    S I G N A T U R E

2

3        This deposition has been read by me and the

4    answers contained therein are true and accurate.

5

6

7

8                    _____

9                    Robert Wolfe

10

11    Subscribed and sworn to before me this

12    12th day of  AUGUST , 2022.

13    

14    Notary Public  # 157.0009019

15

16

17

18

19

20

21

22

23

24

25

Page 263

1    C E R T I F I C A T E

2

3        I, Kim U. Sears, do hereby certify that

4    I reported by stenographic means the

5    deposition of Robert Wolfe, via

6    videoconference, on June 21, 2022, beginning

7    at 10 a.m.

8        I further certify that the foregoing

9    testimony was taken by me stenographically

10    and thereafter reduced to typewriting, and

11    the foregoing 262 pages are a transcript of

12    the stenographic notes taken by me of the

13    evidence and the proceedings, to the best of

14    my ability.

15        I further certify that I am not related

16    to any of the parties thereto or their

17    counsel, and I am in no way interested in

18    the outcome of said cause.

19        Dated at Williston, Vermont, this 27th

20    day of June, 2022.

21

22

23

24

25

Page 264

1                ERRATA SHEET
                 VERITEXT/NEW YORK REPORTING, LLC

2    CASE NAME: Robert Wolfe And Crossfield, Inc. v. Enochian
     Biosciences, Inc.

3    DATE OF DEPOSITION: 6/21/2022
     WITNESSES' NAME: Robert Wolfe

4

5    PAGE  LINE (S)    CHANGE        REASON

6

7                   See Exhibit

8

9

10

11

12

13

14

15

16

17

18

19

20

21                    _____
                      Robert Wolfe

22    SUBSCRIBED AND SWORN TO BEFORE ME
      THIS 12 DAY OF  AUGUST , 20 22

23

24    _____    _____
      (NOTARY PUBLIC)    January 31, 23

25                       MY COMMISSION EXPIRES:

P6(15):     A:     I believe 2 times.

P7(10)      A:     Twice I believe.

P14(12)     A:     I am unemployed except that I am Chairman, CEO and CFO for Advanced
                   Oxygen Technologies Inc.

P24(13)     Change:        "It's a Hungarian Bank"

P76(10)     A:     During the second time that I was employed

P84(13)     A:     for lab equipment.

P110(17)    I don't know what "POTUS" companies are

P123(7)     A:     the Defendants with legal actions, ...

P128-129    NOTE:  UNDER DANISH LAW THIS WAS SETTLED FROM MY
                   ATTORNEYS TO DEFENDANT'S ATTORNEY.

P136(3)     A:     As I recall, the only time he said it or ...

P147(20)    A:     Over the years Ole Abildgaard has brought me business...

P149(2)     A:     ~~Carson Ray~~ should be Karsten Ree

P149(6)     A:     ~~Serhat~~ Institute should be Seraph Institute

P256(8)     A:     ... and Ole Abildgaard said to my attorney that it had been sent to the
                   Danish Press