# EXHIBIT 15

The 30(b)(6) Deposition of

# ENOCHIAN BIOSCIENCES DENMARK ApS

Through

# LUISA PUCHE

In the Matter of

# ROBERT WOLFE, ET AL

versus

# ENOCHIAN BIOSCIENCES INC., ET AL

Taken On

# JUNE 24, 2022



UNITED STATES DISTRICT COURT

DISTRICT OF VERMONT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CASE NO.: 2:21-cv-00053

\* \* \* \* \*

ROBERT WOLFE AND CROSSFIELD, INC.

VERSUS

ENOCHIAN BIOSCIENCES INC., ET AL

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The 30(b)6 deposition of ENOCHIAN BIOSCIENCES DENMARK ApS, through it's representative LUISA PUCHE, taken in connection with the above-captioned cause, pursuant to the following stipulations at a videoconference deposition taken on the 24th of June 2022, beginning at 10:45 a.m.

BEFORE:

Caitlyn J. Connelly, CCR, CVR

Certified Court Reporter

In and for the State of Louisiana

1        and then Robert Wolfe's termination.
2   A.   Yes.
3   Q.   In this -- in this document, it's talking about
4        the consulting agreement between Robert Wolfe
5        and Enochian BioSciences Denmark.  As Enochian
6        BioScience Incorporated US, is it your position
7        as a company, that there was a contract with
8        Robert Wolfe?
9            MR. VALENTE:
10               Objection.
11  A.   It's my understanding there was a consulting
12       agreement.
13  BY MR. MCCABE:
14  Q.   Was that consulting agreement with one company
15       or both companies?
16           MR. VALENTE:
17               I'll object, but go ahead.
18  A.   I believe it was with Denmark, but it was to
19       serve both companies as CFO.
20  BY MR. MCCABE:
21  Q.   In that agreement, was there different duties
22       and obligations Robert Wolfe and Crossfield
23       owed to the different companies?
24  A.   In my review of that contract, I did not think
25       so.  It describes him to be CFO for both, and

1   that it enumerated his responsibilities.  Or at
2   least -- there's never a exhaustive list, but
3   the main duties.
4  Q.  So it's Enochian BioSciences US's position
5   that, that contract applied equally to both
6   companies?
7  A.  Yes.
8  Q.  In -- from your earlier deposition your, I
9   guess -- is the company aware that a Vermont
10  Superior Court ruled differently?
11 A.  I'd have to see the document for the exact
12  verbiage you're asking for.
13 Q.  Give me one second, let me pull another
14  document up.
15          You can refresh, please.
16          (Exhibit 3 was marked for
17  identification.)
18 A.  Sorry, just having a little trouble finding it.
19  I have the document up.
20 BY MR. MCCABE:
21 Q.  Okay.  I'm going to direct you to -- it's the
22  paging of the document.  So starting on the
23  bottom of the second page, we have 1 to page 6
24  of the document.
25 A.  Okay.

1       MR. VALENTE:
2               Objection, but go ahead.
3   A.  I believe the board of directors of Enochian
4       Inc., looks at the company as a totality.  So I
5       don't know that it made a distinction, but
6       rather it's part of the organizational
7       structure.
8   BY MR. MCCABE:
9   Q.  Do you know if the board ever considered the
10      contract with Enochian -- Robert Wolfe having
11      different duties between the two Enochian
12      entities?
13  A.  It's my understanding that it was the same
14      duties for both, and that the contract covered
15      both entities.
16  Q.  I'm going to share a new exhibit.
17              (Exhibit 4 was marked for
18      identification.)
19  A.  Okay.
20  BY MR. MCCABE:
21  Q.  Excuse me.  If you could refresh, please?
22  A.  Sure.  Okay.
23  Q.  I believe this was attached to one of
24      Enochian's filings in the State Court action.
25      It's a 2019 Enochian board calendar, that's

1             it's attorney-client privileged, if it's
2             from the lawyers, that's protected.
3    BY MR. MCCABE:
4    Q.   So for clarification, it's not the information
5         coming from the attorneys, it's the information
6         coming from Mark Dybul, Evelyn D'An, Henrik and
7         Rene.
8    A.   I don't recall a formal meeting. So without
9         going through all my emails, I think it was
10        piecemeal.
11   Q.   Is it fair to say that each of them were
12        contacting you either through email or through
13        phone, and communicating about the underlying
14        facts of that litigation?
15             MR. VALENTE:
16                And objection. To the extent there's
17        attorney-client communications involved,
18        just don't -- don't share those. You can
19        answer the question otherwise.
20   A.   My recollection is that it was email and phone
21        calls.
22   BY MR. MCCABE:
23   Q.   Within those emails and phone calls, was there
24        ever -- or do you recall people bringing up an
25        irreparable harm?

```
1              MR. VALENTE:
2                    Objection, to the extent that the
3              contents of those communications are
4              privileged.  And in particular, because
5              that's a legal term, I'm going to object
6              and -- and instruct the witness not to
7              answer on attorney-client privilege
8              grounds.
9     BY MR. MCCABE:
10    Q.   In those communications, were people -- were --
11         the people giving you information, was there a
12         communication about negative things that would
13         happen because of what Robert -- because of
14         Robert Wolfe's disclosure?
15    A.   The general theme is that it was confidential
16         information that shouldn't be put out in the
17         public, and if so, it could cause harm.  Or --
18    Q.   Was there a spec -- sorry, go ahead.
19    A.   Never mind.  I was going to say, that or any
20         other confidential information he had.  At that
21         point, we weren't sure what he would put out,
22         so it was important.  The confidentiality
23         component is -- was the key to people's
24         concerns.
25    Q.   Was it more a concern of what had been
```

1      disclosed or what could be disclosed?
2  A.  I would say both.
3              (Technical difficulties.)
4          MR. VALENTE:
5              Are you frozen, Dan?
6          THE WITNESS:
7              I think he is.
8          MR. VALENTE:
9              Is the court reporter on?  Are we
10         frozen or is Mr. McCabe frozen?
11         THE COURT REPORTER:
12             I'm here.  He seems to be frozen.
13         MR. VALENTE:
14             Got it.  Okay, I appreciate that.
15             Mr. McCabe, are you -- Dan, are you
16         there?
17         THE COURT REPORTER:
18             Not yet, he's still frozen for me.
19         THE VIDEOGRAPHER:
20             All right.  Let's go off the record.
21         Time is 12:00 p.m.  We're off the record.
22             (Off the record.)
23         THE VIDEOGRAPHER:
24             We're back on the record, time is
25         12:49 p.m.

|   |   |   |
|---|---|---|
| 1 |  | which meetings took place.  I know for a lot of |
| 2 |  | companies, March of 2020, there was a lot of |
| 3 |  | emergency meetings because of COVID.  So the |
| 4 |  | corresponding times, I'm trying to figure out |
| 5 |  | if any decision would've been made at a special |
| 6 |  | meeting, if it occurred. |
| 7 | A. | I don't recall a special meeting.  I'd have to |
| 8 |  | look at minutes to see when the meetings |
| 9 |  | occurred during that time period. |
| 10 | Q. | Do you know when the board decided to stop the |
| 11 |  | Vermont litigation, was there any sort of cost |
| 12 |  | benefit analysis of continuing it? |
| 13 | A. | Define cost benefit analysis.  Like you mean |
| 14 |  | some calculation somewhere, or just a general |
| 15 |  | -- |
| 16 | Q. | Just a general, why the board at that point |
| 17 |  | decided to stop the litigation? |
| 18 | A. | Right.  So it's my understanding that the -- |
| 19 |  | because of all of the economic disruption and |
| 20 |  | uncertainty that there was surrounding the |
| 21 |  | COVID situation, and trying to maximize our |
| 22 |  | funding to focus on scientific endeavors, and |
| 23 |  | the fact that we weren't anywhere close to |
| 24 |  | settling, the company felt that it was in it's |
| 25 |  | best interest to stop pursuing this case due to |

1     time, effort and money.
2  Q. Was the board concerned about Robert Wolfe
3     disclosing more confidential information at
4     that point?
5  A. Well, when you say "at that point," do you mean
6     that they weren't concerned about it before?
7  Q. Earlier in your testimony -- I'm not trying to
8     characterize this incorrectly, I'm just
9     bringing you back to before the break.
10 A. Uh-huh.
11 Q. My understanding was your communications with
12    the board members prior to the Vermont
13    litigation being filed, was -- the concern was
14    two parts.  One, was Serhat Gumrukcu's safety,
15    and the other was disclosure of confidential
16    information.
17 A. Correct.
18 Q. At the time the board decided to discontinue
19    the litigation, were they less concerned about
20    the disclosure of confidential information?
21 A. I don't think that the confidential information
22    ever became less worrisome.  It's just that
23    there are times where you have to make business
24    decisions to move forward with something or to
25    stop something.  And because of the economic

1         uncertainty and all the other issues
2         surrounding COVID with business disruption,
3         they just felt that it was appropriate to try
4         to move forward and not continue to pursue
5         this.
6  Q.  Was there significant concerns for Serhat
7         Gumrukcu's safety at that point?
8  A.  Well, I think based on their decision to pay
9         for security, there's always been a safety
10        concern.
11 Q.  I'm sorry, let me rephrase the question.
12        Serhat's safety was a concern at the time of
13        the initial filing.  But the decision to
14        discontinue the Vermont case, was there still a
15        concern that Robert Wolfe's disclosure would
16        put Serhat's safety in danger?
17 A.  I don't think that position changed.  It's
18        about the pursuit of the legal case that
19        changed.  I think that the company still felt
20        that they had good standing for what they
21        originally initiated.  It's just sometimes you
22        just have to -- business decisions require you
23        to make tough decisions.  And this was one of
24        them.  They felt that the money spent -- to
25        discontinue -- to discontinue the money that is

1    continuing to be spent, and to focus on things
2    that were more important to the future of the
3    organization.
4  Q. And do you have any estimate about how much
5    money was spent on the Vermont litigation?
6  A. The first one?
7  Q. Yes.
8  A. Don't hold me to it, but close to around
9    $300,000, give or take.
10 Q. Since -- I'm sorry. I took a drink and then
11   interrupted you taking one. Since the Orange
12   County litigation was dismissed, has there been
13   any specific harm that's occurred because of
14   the disclosure in the Danish complaint?
15 A. Harm to whom?
16 Q. Harm to Enochian BioSciences US.
17 A. Well, I think that our position is that any
18   confidential information that's put out in the
19   public domain is harmful to us, because it can
20   never be taken back. So that harm wouldn't
21   really go away one way or the other. I mean
22   the harm's been done, right?
23 Q. So if we say that the harm was the disclosure,
24   was there any other specific harm that flowed
25   from the disclosure, any time after the Orange

```
1          County dismissal?
2    A.    Outside of what I just said, I'm not personally
3          aware or have knowledge or something that I can
4          point to.
5    Q.    Can you point to anything during the pendency
6          of the Orange County litigation?
7    A.    I'm sorry, can I point anything to what?
8    Q.    Can you point to any specific harm that
9          occurred while the Orange County litigation was
10         pending?
11              MR. VALENTE:
12                   Objection.
13   A.    It would still be the same thing, right?
14         Confidential information was put out into
15         public domain, and that is harmful in itself.
16   BY MR. MCCABE:
17   Q.    Is there anything subsequent to that -- that
18         disclosure being put out, that was harmful to
19         the company?
20   A.    I can't pinpoint anything specific.
21   Q.    And would that be the same answer for Enochian
22         APS as well?  I wasn't clear which company I
23         was talking about.
24   A.    Yeah, it would be the same for both.
25   Q.    At the board meeting prior to filing the
```

1  Vermont action, was it ever discussed what the
2  affect on Bob's reputation would be from the
3  filing?
4        MR. VALENTE:
5             Objection.
6  A. I'm not aware that there was ever a
7  conversation about his reputation when it came
8  to this.  It was a business decision based on
9  the fact that confidential information had been
10 disclosed, and what could we do to mitigate the
11 risk of that getting out further, or any other
12 confidential information getting out.  But that
13 wasn't a decision point, I don't believe.
14 BY MR. MCCABE:
15 Q. Was anybody on the board frustrated with Bob?
16 A. Frustrated is a subjective word.  I don't know
17 what you mean by that.
18 Q. In your communications with the different board
19 members, did anybody ever express that they
20 were angry with what he had done?
21 A. You're saying for -- with my communication,
22 specifically?
23 Q. Correct.
24 A. I never heard anybody say that they were angry
25 with him.

1  Q.   I'm going to upload another exhibit.  Maybe I'm
2       not -- if you could reset your Exhibit share
3       please.
4            (Exhibit 6 was marked for
5       identification.)
6  A.   Okay.
7  BY MR. MCCABE:
8  Q.   This is a report prepared by Weaver Group.  Do
9       you know who commissioned this report to be
10      completed?
11 A.   I became familiar with this report during this
12      litigation.  I had never seen this before.
13      It's my understanding in preparing for this,
14      that Olie Albigard [sic] commissioned this, but
15      it was not by request of us or Enochian.  We
16      didn't request it.  Quite frankly, I never saw
17      this till this litigation.  I've never seen
18      this report before.  I do understand that maybe
19      there were one or two other individuals at
20      Enochian that may have, but I never saw this
21      report.  And it's my understanding that it was
22      not commissioned by us.  It was not approved by
23      us.  It was not paid by us, and we never did
24      anything with this.
25 Q.   What's Olie Albigard, am I saying his name

```
 1   A.   Let me read it.  Just that first sentence,
 2        first bullet?
 3   Q.   The five bullets there.
 4   A.   Okay.  Okay, I've read it.  I don't
 5        specifically remember focusing on this -- like
 6        I said, I was shown the report that it existed,
 7        I didn't really read it in depth.
 8   Q.   Would you agree that it's a business risk
 9        assessment for Enochian BioSciences?
10            MR. VALENTE:
11                Objection.  I mean, you can answer.
12   A.   We didn't commission this, so regardless of
13        what it says, we didn't commission this report.
14        So I can't opine on the motivation or
15        background on what's here.
16   BY MR. MCCABE:
17   Q.   And this report, was it ever shown to the
18        board?
19   A.   I wasn't aware of it.  And it's my
20        understanding that outside of one or two other
21        privy people, that most people aren't aware of
22        this report.
23   Q.   And the one or two other people, is Rene
24        Sindlev and who else?
25   A.   Mark Dybul.
```

1  Q.  Do you know if either Rene Sindlev or Mark
2      Dybul took any action based on this report?
3  A.  It's my understanding that this report, no one
4      took action on Enochian's behalf.
5  Q.  Do you know if anyone took action on any
6      personal behalf?
7  A.  I'm --
8          MR. VALENTE:
9              Objection, that's outside of the
10         company's knowledge.
11 A.  I don't know.
12         MR. VALENTE:
13             Yeah, it's outside of the topic, I
14         guess you can answer if you know.
15 A.  I have no idea.  Again, I didn't even know this
16     report existed until this litigation happened.
17 BY MR. MCCABE:
18 Q.  Do you know if Rene Sindlev or Mark Dybul
19     distributed this report to anyone?
20 A.  To my recollection, I don't know.  I'm not
21     aware that they have.
22 Q.  Does Enochian BioSciences Incorporated continue
23     any contracts with Weaver Group?
24 A.  No.
25 Q.  Is there any specific reason why not?

*Robert Wolfe and Crossfield, Inc. v. Enochian BioSciences, Inc. et al.*,
Civil Action No. 2:21-cv-00053-cr (D. Vt.)

**WITNESS:** Luisa Puche (Rule 30(b)(6) Deposition)
**DATE OF DEPOSITION:** June 24, 2022

### DEPOSITION ERRATA SHEET

| Page No.: | Line No.: | Change or Correction and Reason: |
|---|---|---|
| 11 | 24 | Change "Whitter" to "Wittekind" (Correction) |
| 12 | 15 | Change "Whitter" to "Wittekind" (Correction) |
| 12 | 20 | Change "Whitter" to "Wittekind" (Correction) |
| 12 | 23 | Change "Whitter" to "Wittekind" (Correction) |
| 13 | 15 | Change "Whitner" to "Wittekind" (Correction) |
| 22 | 24 | Change "trading, there was. Code of Ethics, I believe" to "trading policy was in place. I believe the Code of Ethics was also in place." (Clarification) |
| 24 | 20 | Change "in from 2018" to "from 2018" (Correction) |
| 24 | 25 | Change "that where" to "where" (Correction) |
| 28 | 19 | Change "write" to "prepare" (Clarification) |
| 29 | 8 | Change "but that" to "it is my understanding that there were deficiencies with Mr. Wolfe's original drafts of SEC filings, not with Enochian's overall process for SEC filings. (Clarification) |
| 29 | 8 | Change "is my understanding" to "That is my understanding" (Clarification) |
| 30 | 17 | Change "So I did" to "I did" (Clarification) |
| 61 | 23 | Change "any" to "anything" (Correction) |
| 74 | 12 | Change "that, that" to "that that" (Correction) |
| 77 | 3 | Change "that this" to "that with respect to this" (Clarification) |
| 103 | 1 | Change "council" to "counsel" (Correction) |
| 104 | 1 | Change "little bit more" to "little bit more noticeable" (Clarification) |

SIGNATURE: *Luisa Puche* (DocuSigned)
LUISA PUCHE

DATE: 8/8/2022