UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. District Court
DISTRICT OF VERMONT
FILED

**2023 AUG 24  PM 4: 36**

CLERK

BY _____
DEPUTY CLERK

| | |
|---|---|
| ROBERT WOLFE and CROSSFIELD, INC., | ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Case No. 2:21-cv-00053 |
| | ) |
| ENOCHIAN BIOSCIENCES DENMARK APS, RENÉ SINDLEV, LUISA PUCHE, and ENOCHIAN BIOSCIENCES, INC., | ) ) ) ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Docs. 81 & 82)

Plaintiffs Robert Wolfe and Crossfield, Inc. ("Crossfield") (collectively, "Plaintiffs") bring a claim of malicious prosecution against Defendants Enochian BioSciences Denmark ApS ("Enochian Denmark"), Enochian BioSciences, Inc. ("Enochian BioSciences") (collectively with Enochian Denmark, "Enochian"), Rene Sindlev, and Luisa Puche (collectively, "Defendants"), alleging that Defendants improperly initiated a case against them in Vermont Superior Court (the "Underlying Action") to gain leverage in litigation in Denmark (the "Danish Litigation") and to harm Plaintiffs professionally and financially. Plaintiffs seek compensatory and punitive damages as well as attorney's fees and costs and prejudgment interest.

On November 29, 2022, Defendants filed a motion for summary judgment and a motion to exclude Plaintiffs' expert Jeffrey R. Ketchum. (Docs. 81, 82). Plaintiffs responded to both motions on January 4, 2023 (Docs. 91, 92), and Defendants replied on February 3, 2023. (Docs. 98, 101.) The court heard oral argument on the pending motions

on March 23, 2023. Following the hearing, the parties filed supplemental memoranda on April 7, 2023 (Doc. 106) and April 20, 2023 (Doc. 107), at which time the court took the motions under advisement.

Plaintiffs are represented by Daniel D. McCabe, Esq., Matthew S. Borick, Esq., and Timothy C. Doherty, Esq. Defendants are represented by Christopher J. Valente, Esq., Michael R. Creta, Esq., and David M. Pocius, Esq.

## MOTION TO EXCLUDE

### I.      Whether to Exclude Plaintiffs' Expert Witness Jeffrey R. Ketchum.

Plaintiffs' expert Mr. Ketchum is an executive search researcher and consultant who has worked in the executive recruitment industry since 1989. Mr. Ketchum graduated from Cornell University's Advanced Program for Executive Search and Leadership Consulting, an MBA-level certificate program, and is one of 286 individuals worldwide with a Certified Researcher/Associate certification from the Association of Executive Search and Leadership Consultants.

Mr. Ketchum is trained in Topgrading, a method of interviewing and assessing candidates for employment. He is the President of Lordstone Corporation, an executive search and strategic human resources consulting firm, as well as of its subsidiary Dieck Executive Search, Inc., a retained executive search firm that concentrates on the biotechnology and healthcare sectors. In these positions, he has gained experience in performing executive job search analysis; interviewing; conducting media research; and assessing executive skills, performance, and compensation for executive recruitment. He has testified as an expert witness in depositions in the Southern District of Florida and Nevada state court, as well as in a Michigan state court trial.

In addition to relying on his professional experience and education to develop his expert witness opinions in this case, Mr. Ketchum interviewed Mr. Wolfe twelve times in August and September 2022; conducted media research; spoke with two of Mr. Wolfe's references; and reviewed information Mr. Wolfe provided regarding his networking, job applications, and contacts with recruiters.

2

### 1.    Mr. Ketchum's Opinions.

With regard to "[t]he career opportunities that [P]laintiff would likely be qualified for and the associated direct compensation ranges for someone of his credentials, experiences and employment history" (Doc. 82-14 at 2), Mr. Ketchum opines as follows: "The career opportunity that Mr. Wolfe would more than likely be qualified for would be a Chief Financial Officer[] (CFO) position within a privately held corporation looking to go public or a publicly traded company looking to grow." *Id.* at 15. "The associated direct compensation ranges for someone of Mr. Wolfe's credentials, experiences and employment history would be between two hundred forty thousand dollars ($240,000) and five hundred thousand dollars ($500,000)[.]" *Id.* at 16.

Asked "[w]hether [P]laintiff used reasonable efforts to find substantially equivalent employment after his termination from [D]efendants[,]" *id.* at 2, Mr. Ketchum opines that "Mr. Wolfe used reasonable efforts to find substantially equivalent employment after his termination from [Enochian]." *Id.* at 16.

With regard to "[t]he role that referencing and media research play in the hiring of executive level candidates and the degree to which it may have made it more difficult for [P]laintiff to find a job as a CFO[,]" *id.* at 2, Mr. Ketchum opines: "The press that Mr. Wolfe received after his termination from Enochian Biosciences, Inc. would have substantially impeded his search for substantially equivalent employment." (Doc. 82-14 at 18.)

### 2.    Standard of Review.

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

3

Rule 702 obligates the court to serve as a gatekeeper for expert testimony, ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

"In deciding whether . . . an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). An expert's testimony must not be conclusory or speculative and must be grounded in reliable evidence. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("At trial, proffered expert testimony should be excluded if it is speculative or conjectural; the [a]dmission of expert testimony based on speculative assumptions is an abuse of discretion[.]") (first alteration in original) (internal quotation marks and citations omitted). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702.

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also United States v. LaVictor*, 848 F.3d 428, 444 (6th Cir. 2017) (holding that "[a]ny emerging prejudice [from an expert witness's testimony] was addressed during cross-examination").

### 3. Whether Mr. Ketchum's Expert Witness Opinions are Admissible Under Rule 702.

Defendants do not challenge Mr. Ketchum's qualifications. The court agrees that Mr. Ketchum's extensive professional experience in the executive recruitment industry and his continuing education in that field qualify him as an expert on executive salaries, job searches, and recruitment. *See United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) ("To determine whether a witness qualifies as an expert, courts compare the area in

4

which the witness has superior knowledge, education, experience, or skill with the
subject matter of the proffered testimony.").

Despite his qualifications, Defendants assert that Mr. Ketchum's opinions must be
excluded as unreliable because they are not based upon a discernible methodology but
were "reverse engineer[ed]" to reach a desired conclusion. (Doc. 82-13 at 13.) They
further challenge Mr. Ketchum's opinion regarding the impact of media coverage of Mr.
Wolfe's job search as being "completely untethered from the task at hand" and unfairly
prejudicial. *Id.* at 3 (internal quotation marks omitted). Defendants provide expert rebuttal
reports from their expert witnesses, Richard A. Risch and Robert W. Lashway, which
criticize Mr. Ketchum's methodology and conclusions.

### 1.    Opinion Regarding Job Qualifications and Associated Compensation.

Mr. Ketchum opines that Mr. Wolfe would be qualified for a CFO position. He
explains that his opinion regarding Mr. Wolfe's qualifications is supported by Mr.
Wolfe's past employment as a corporate officer, Mr. Wolfe's experience with corporate
finance, and his classification of Mr. Wolfe as a "11-1011 Chief Executive" according to
the United States Bureau of Labor Statistics' 2018 Standard Occupational Classification
System. (Doc. 82-14 at 16.) The factual support for Mr. Ketchum's opinion on this issue
establishes that his opinion is grounded in reliable evidence and is admissible.

In contrast, Mr. Ketchum bases his opinion that the associated compensation range
for someone with Mr. Wolfe's qualifications would be between $240,000 and $500,000
solely on Mr. Wolfe's highest annual compensation as Enochian's CFO and on the 2019
compensation of Mr. Wolfe's successor as CFO, Ms. Puche. Mr. Ketchum does not
explain why he believes Mr. Wolfe's compensation should fall within this range. He does
not compare the qualifications of Mr. Wolfe and Ms. Puche or analyze the services they
provided to Enochian as CFO. He has not evaluated Mr. Wolfe's compensation for any
employment before his employment with Enochian or the available compensation for the

positions for which Mr. Wolfe applied after Enochian terminated him.[1] Nor does he consider that Ms. Puche's annual compensation of $280,000 in 2020 and $275,000 in 2021 was significantly less than her compensation in 2019. His opinion does not account for the fact that the majority of Ms. Puche's 2019 compensation was in stocks and options rather than cash. He provides no assessment of the current market rates or standards for CFO compensation or benefits.[2] His opinion thus remains wholly conclusory and appears to be designed to maximize Mr. Wolfe's compensation range without taking into consideration his history of making far less.[3] The fact that Mr. Ketchum's opinion was derived solely for purposes of litigation further undercuts its reliability. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (expressing a preference for opinions derived not solely for litigation purposes because "an expert [who] testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science").

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between

---

[1] Mr. Ketchum admitted that he asked to see Mr. Wolfe's tax returns because he wanted to examine Mr. Wolfe's "historical earnings figures" but Plaintiffs did not provide him with the tax returns, and he did not discuss them in his expert report. (Doc. 82-3 at 28.) This reflects insufficient rigor and overreliance on a party's version of the events. "Assumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation[,] are not reasonable." *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011) (internal quotation marks omitted).

[2] Mr. Ketchum testified that he "could [] provide an estimate of what the average compensation is for a CFO of a publicly[] traded company" "[i]f that was within the scope of the opinion and I was retained to do that," but stated without explanation that he could not provide such an estimate in this action. Doc. 82-3 at 13 ("Q. Can you . . . provide that [average CFO compensation] estimate right now to me? A. No.").

[3] For example, Mr. Wolfe received $72,000 in 2019 from his financial consulting work for IProcessManager. (Doc. 82-17 at 4.) He has not received any compensation from IProcessManager for his position as an officer and director. Despite being CEO of Advanced Oxygen Technologies, the only compensation Mr. Wolfe received from that company was stocks worth $113,000 in 2018 or 2019. *Id.* at 6.

the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Because Mr. Ketchum fails to explain why the two data points he used to create a salary range for Mr. Wolfe are sufficient to support his opinion, the analytical gap is too great to be reliable under Rule 702.

For the reasons stated above, the court DENIES Defendants' motion to exclude Mr. Ketchum's opinion regarding Mr. Wolfe's qualifications as a CFO and GRANTS Defendants' motion to exclude Mr. Ketchum's opinion regarding Mr. Wolfe's probable compensation range.

### 2.    Opinion Regarding the Reasonableness of Mr. Wolfe's Job Search.

Mr. Ketchum opines that Mr. Wolfe's efforts to find "substantially equivalent employment" following his termination from Enochian BioSciences were "reasonable" because Mr. Wolfe applied to seventy-one positions through the Indeed.com website, contacted eighteen recruiters at three of the largest North American recruiting firms, and engaged in networking. (Doc. 82-14 at 16.) Mr. Ketchum explains that networking "is confirmed to be one of the top ways for senior level executives to find a job" and that most substantially equivalent positions for which Mr. Wolfe is qualified "cannot be applied for by responding to online job posts or by calling a company and asking if they are accepting applications." *Id.* at 17-18.

To assess Mr. Wolfe's networking efforts, Mr. Ketchum reviewed a spreadsheet Mr. Wolfe provided which contains 2,506 "select communications between Mr. Wolfe and his contact network." *Id.* at 17. He asked Mr. Wolfe to provide his email correspondence with recruiters and reviewed the substance of those emails. Mr. Ketchum ultimately reviewed fewer than one hundred of the emails on Mr. Wolfe's spreadsheet. Defendants argue that Mr. Ketchum's opinion relies on unverified data, ignores unfavorable facts, and is bereft of an adequate explanation as to how he reached his conclusion.

As a threshold issue, Mr. Ketchum's opinion regarding whether Mr. Wolfe's efforts to find substantially equivalent employment after his termination were

7

"reasonable" is "problematic as it invades the province of the jury." *Grajeda v. Vail Resorts Inc.*, 2023 WL 2613543, at \*6 (D. Vt. Mar. 23, 2023). "[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *see also Grajeda*, 2023 WL 2613543, at \*6 (holding expert witness's opinion that "[d]efendants' snowmaking equipment placement was 'unreasonable'" was an ultimate legal conclusion and "thus not appropriate for expert testimony") (internal quotation marks omitted); *Sec. & Exch. Comm'n v. Am. Growth Funding II, LLC*, 2019 WL 1772509, at \*2 (S.D.N.Y. Apr. 23, 2019) (finding that "whether a reasonable investor would be materially misled by" particular language was an "ultimate legal conclusion" for the jury) (internal quotation marks omitted). Because reasonableness is a "determination [that] rests with the jury[,]" Mr. Ketchum's opinion regarding the reasonableness of Mr. Wolfe's job search efforts is a legal conclusion that is not "appropriate for expert testimony." *Id.* (quoting *Bilzerian*, 926 F.2d at 1294).

Expert testimony should also be excluded "if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison[.]" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal citations and quotation marks omitted). "Other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (alteration adopted) (internal quotation marks omitted). "A district court has discretion under Federal Rule of Evidence 703 to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *Boucher*, 73 F.3d at 21 (internal quotation marks omitted).

In concluding Mr. Wolfe's networking efforts were reasonable, Mr. Ketchum did not "independently verif[y] the substance" of 2,400 or more emails in Mr. Wolfe's spreadsheet. Doc. 82-3 at 36; *see also id.* at 39 ("A. I cannot confirm that [the approximately 2,400 emails] contain information regarding networking. They did or they didn't because I haven't reviewed them."). During his deposition, he acknowledged that

8

some emails in the spreadsheet appear unrelated to Mr. Wolfe's networking efforts. *See id.* at 38 ("Q. Based on the subject lines of [a selection of] the e-mails, it looks like nearly all of them related to signing different real estate-affiliated documents, correct? A. Yes."); *id.* (acknowledging emails related to "lead paint disclosures are not related to Mr. Wolfe's job hunt"). Despite stating that he did not know how "Mr. Wolfe decide[d] what emails to include in this [spreadsheet] and wh[ich] ones to exclude[,]" *id.* at 37, Mr. Ketchum nonetheless found the spreadsheet to be a reliable basis for his opinion. To the extent that opinion depends upon the accuracy of the underlying data, it is fatally flawed. *See* Fed. R. Evid. 703 (requiring the facts and data upon which an expert opinion is based to be of a type that "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject").

With regard to the fewer than one hundred emails which he reviewed, Mr. Ketchum failed to explain how these emails demonstrated that Mr. Wolfe "has continued to grow and cultivate his network." (Doc. 82-14 at 17.) Beyond testifying that these emails contained correspondence with recruiters, he did not address the nature of the correspondence or how the correspondence contributed to Mr. Wolfe's networking efforts. Similarly, although Mr. Ketchum cites Mr. Wolfe's contacts with eighteen recruiters at three networking firms as evidence of the reasonableness of Mr. Wolfe's job search, he does not explain the extent, substance, or impact of these contacts. As he did not interview any of the recruiters or firms regarding their interactions with Mr. Wolfe, his only apparent knowledge of these contacts has been supplied by Mr. Wolfe. To the extent Mr. Ketchum assumes that Mr. Wolfe's communications with the recruiters were reasonable, this conclusion is pure conjecture. The court need not accept Mr. Ketchum's unverified "say-so." *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 433 (S.D.N.Y. 2016) (rejecting expert witness opinion that "impermissibly [drew] grossly overreaching conclusions, which [were] connected solely to the data by [the expert's] say-so") (citing *Joiner*, 522 U.S. at 146).

Arguing that Mr. Ketchum omits unfavorable data from his opinion, Defendants observe that he does not address Mr. Wolfe's failure to apply for any jobs after May 14,

2020. Defendants' rebuttal expert Mr. Risch opines: "Failing to apply for even a single job in over 2.5 years does not demonstrate a reasonable attempt to secure new employment." (Doc. 82-15 at 20.) Mr. Ketchum testified in deposition that his "understanding was that with C[OVID] and his particular job search, [Mr. Wolfe] focused more on his networking at that time than . . . previously" (Doc. 82-3 at 31), but he does not explain why these efforts constituted a sufficient job search.

Defendants further contend that Mr. Ketchum's report and deposition testimony are internally inconsistent. Although Mr. Ketchum agrees that LinkedIn is "an absolute must for contemporary executives[,]" *id.* at 5 (internal quotation marks omitted), he also testified that "what [Mr. Wolfe's] LinkedIn profile said to me was he wasn't using it very much. It was there, but in a very limited manner[,]" and that "[i]f his strategy was to utilize LinkedIn to either obtain business or to find a job, and he was actively a LinkedIn user, I would expect to see an expanded profile." *Id.* at 27 (agreeing that Mr. Wolfe's profile "isn't a very developed LinkedIn profile"). His report does not discuss Mr. Wolfe's LinkedIn presence or lack thereof.

Mr. Ketchum also cites an industry publication advising that job boards are not a productive way to search for executive-level jobs, a premise with which Mr. Risch agrees. Despite opining that "[t]he fact is that most senior level executive positions that would be substantially equivalent to what Mr. Wolfe held with Enochian BioSciences[] cannot be applied for by responding to online job posts[,]" (Doc 82-14 at 18), Mr. Ketchum cites Mr. Wolfe's seventy-one applications to jobs posted on a job board to support his opinions. These apparent contradictions are more than a "minor flaw" in his reasoning. They reveal that Mr. Ketchum "lack[ed] good grounds for his . . . conclusions." *Amorgianos*, 303 F.3d at 267 ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions.") (internal

10

quotation marks omitted).[4]

For the foregoing reasons, Mr. Ketchum's opinion regarding the "reasonableness" of Mr. Wolfe's job search efforts invades the province of the jury and is insufficiently reliable under Rule 702. It is thus inadmissible. Even if it were admissible under Rule 702, it is likely to confuse or mislead the jury as it vouches for Mr. Wolfe's own opinion of his job search efforts in the guise of an expert witness opinion. As a result, its potential for unfair prejudice substantially outweighs its probative value. *See* Fed. R. Evid. 403.

Mr. Ketchum may testify generally regarding the use of the networking in executive job searches. He may also testify regarding how Mr. Wolfe's attempts to network compare with best practices for executive-level networking, provided that in doing so he explains how the facts and his experience support his conclusions. He may not, however, opine that Mr. Wolfe's efforts were reasonable or that his spreadsheet reflects his efforts when Mr. Ketchum has taken inadequate steps to verify its content. Defendants' motion to exclude Mr. Ketchum's opinion regarding Mr. Wolfe's job search efforts is therefore GRANTED IN PART and DENIED IN PART.

### 3.    Media Research Opinion.

Based on his professional knowledge of and experience conducting background screening for executive candidates, Mr. Ketchum opines that "[a] critical component when hiring at an executive level is background screening" and concludes that the media following Mr. Wolfe's termination as Enochian's CFO would have "substantially impeded" his search for substantially similar employment. (Doc. 82-14 at 18.) Defendants argue Mr. Ketchum's opinion is irrelevant because Plaintiffs' malicious

---

[4] In contrast, one district court found that an expert vocational rehabilitation counselor's opinion was reliable where the expert "plainly articulated" a methodology involving:

> eight different factors she examines in assessing the reasonable diligence of an individual's job search, including: (1) consistency and/or pattern of job search activities; (2) number of applications submitted; (3) the period of time in which applications are submitted; (4) follow-up activities; (5) whether interview were granted/attended; (6) the outcomes of interviews; (7) job offer status; and (8) the applicability of jobs being applied for.

*Dries v. Sprinklr, Inc.*, 2020 WL 7425602, at \*2, \*4 (W.D. Wash. Dec. 18, 2020).

prosecution claim relates to the Underlying Action, not to Mr. Wolfe's termination. They further assert that this opinion is unreliable because Mr. Ketchum "reverse engineer[ed]" his conclusion by omitting results from his media research that conflicted with his desired outcome. (Doc. 82-13 at 13.)

Mr. Ketchum's description of his media research is cursory. His opinion cites no media articles discussing the Underlying Action. Instead, he quotes directly from Enochian's Complaint in the Underlying Action and highlights news articles about Plaintiffs' malicious prosecution action in this court. He also cites news articles discussing Mr. Wolfe's connections with a former Enochian employee who was later accused of participating in a homicide. Mr. Ketchum's causation opinion is based largely on a general statement that "when a senior level executive like Robert Wolfe is publicly accused in a court of law of wrongful conduct . . . , these comments can give rise to doubts about Mr. Wolfe's character and conduct." (Doc. 82-14 at 21) (emphasis omitted). Mr. Ketchum's report also concludes: "Furthermore, the Google search results, articles in foreign media and the Stiig Waever report[] deepen the stain on Mr. Wolfe[] that cannot be removed." (Doc. 82-14 at 21.)

Mr. Ketchum attached the top twenty results from a Google search of the phrase "robert wolfe enochian" as an exhibit to his expert report. (Doc. 82-14 at 137.) Only two of those results, which appear fourteenth and fifteenth on the list, relate to the Underlying Action.[5] *See* Doc. 82-3 at 16 ("Q. So apart . . . from number 14, . . . can you identify any other hits in this list of [twenty] documents that are about the [Underlying] [A]ction? A. No."). Three of the first five results relate to Plaintiffs' filing of the instant action. The

---

[5] Both links are to "www.slideshare.net." (Doc. 82-14 at 137.) One is entitled "Affidavit of Robert Wolfe – Slideshare" with a description that states: "ENOCHIAN BIOSCIENCES INC. (FORMERLY DANDRIT BIOTECH USA INC.) AND[] EXHIBIT 2 FILED VERMONT SUPERIOR COURT AUG'~ 5 2019[.]" *Id.* The other is entitled "Robert Wolfe Lawsuit – Memorandum in Opposition.pdf" with a description that states: "Downs Rachlin Martin PLLC STATE OF VERMONT SUPERIOR COURT CIVIL DIVISION Orange United Docket No. 24-2-19 Oecv ENOCHIAN BIOSCIENCES DENMARK, ApS[.]" *Id.*

remainder appear to include links to websites about Mr. Wolfe's professional history[6] or to the former Enochian employee charged in a murder-for-hire case.[7]

Mr. Ketchum testified that he ran additional Google searches for Mr. Wolfe's name and the terms "Advanced Oxygen Technologies" and "Crossfield" but did not attach the results of those searches to his report or discuss them in the report. (Doc. 82-3 at 18.) He also conducted searches on different platforms, including Factiva and Bing, but did not include those searches in his report. Mr. Ketchum stated that he did not include those results because they were not "relevant." *Id.* at 25. He explained: "if there was any press that was related, I reviewed that. If it was relevant, I included it. If it was not relevant, it was not included." *Id.* He further explained that to determine which press was relevant, he "relied on the direction of [his] opinion to do so, what [he] was asked to do in this case." *Id.* Mr. Ketchum's omission of his search results raises concerns that he improperly ignored relevant but unfavorable evidence. *See In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018) ("Opinions that assume a conclusion and reverse-engineer a theory to fit that conclusion are, similarly, inadmissible.") (alteration adopted) (internal quotation marks omitted), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020); *id.* at 242 ("[A]n expert may not pick and choose from the scientific landscape and present the [c]ourt with what he believes the final picture looks like. Where an expert ignores evidence that is highly relevant to his conclusion, contrary to his own stated methodology, exclusion of the expert's testimony is warranted.") (internal quotation marks and citations omitted).

Mr. Ketchum does not offer an admissible causation opinion related to the impact of Mr. Wolfe's termination on his future job prospects. *See* Doc. 82-3 at 7-8 ("Q. Can

---

[6] For example, the third link is "Robert Wolfe – Executive of ENOCHIAN BIOSCIENCES INC" and has the description: "Wolfe has served as President, CEO and director of Crossfield, Inc., Crossfield Investments, LLC, Drumbeg Ltd, Baldwin Construction Inc. and Ludlow Leasing, Inc." *Id.* at 137.

[7] For example, the seventeenth result is "Enochian Biosciences: Stunning murder allegations raise ..." *Id.* at 137.

13

you identify any specific employers that rejected Mr. Wolfe because of allegations raised in the [Underlying] [A]ction? A. No."); *id.* at 11 ("A. You aren't able to say that Mr. Wolfe hasn't been able to get a new job because of allegations that he disclosed Enochian confidential information, correct? A. I can't say if he has or if he hasn't."). He, instead, seeks to opine that adverse press regarding Mr. Wolfe's termination substantially impaired his ability to obtain equivalent employment without any factual basis for that opinion.

Because Mr. Ketchum does not segregate how much of the "stain on Mr. Wolfe" (Doc. 82-14 at 21) was allegedly caused by Defendants and how much of it was self-inflicted, he does not account for the negative publicity resulting from this lawsuit, which Plaintiffs filed, or resulting from Mr. Wolfe's association with a person accused of criminal activity. "[E]ven though an expert need not rule out every potential cause in order to satisfy *Daubert,* the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *Davids v. Novartis Pharms. Corp.*, 857 F. Supp. 2d 267, 278 (E.D.N.Y. 2012) (internal quotation marks omitted); *see also MacSwan v. Merck & Co.*, 2023 WL 3990673, at *6 (W.D.N.Y. June 14, 2023) ("Dr. Morhaim's failure to . . . exclude other potential causes of [p]laintiff's dental conditions undermines the reliability of his opinions.").

An expert witness's testimony must not only "rest[] on a reliable foundation[,]" it must also be "relevant to the task at hand[,]" *Amorgianos*, 303 F.3d at 265, and "help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702. Mr. Ketchum's opinion that it may hurt an individual's employment opportunities to be publicly accused of wrongful conduct in a lawsuit is not testimony that relies on specialized knowledge or is helpful to the jury. It instead merely reflects Mr. Ketchum's exercise of "'common sense' that may be 'only slightly more than [that of] a layperson.'" *Grajeda*, 2023 WL 2613543, at *6 (alteration in original) (quoting *Difrancesco v. Win-Sum Ski Corp.*, 2017 WL 1046741, at *14 (W.D.N.Y. Mar. 20, 2017)).

Mr. Ketchum's opinion regarding media coverage is not reliable or relevant to the

14

question of the damages Plaintiffs sustained due to the Underlying Action and thus would not assist the jury in determining a fact in issue. *See* Fed. R. Evid. 702. Defendants' motion to exclude Mr. Ketchum's opinion regarding the effect of adverse media on Mr. Wolfe's job search is therefore GRANTED.

## MOTION FOR SUMMARY JUDGMENT

## II.    Undisputed Facts.[8]

Mr. Wolfe is a citizen of the state of Vermont and at all relevant times resided in Randolph, Vermont. Crossfield is a Wyoming corporation, and Mr. Wolfe is its chairman, Chief Executive Officer ("CEO"), and sole shareholder.

Enochian Denmark is a foreign corporation located in Denmark. Enochian BioSciences is a publicly traded Delaware corporation with its principal place of business in Los Angeles, California; it is the parent company of Enochian Denmark. Mr. Sindlev is Chairman of the Board of Enochian BioSciences, and Ms. Puche is the CFO of Enochian BioSciences. Enochian BioSciences is a biopharmaceutical company that develops and manufactures gene-modified cell therapy.

On or around July 11, 2017, Enochian Denmark entered into a CFO Service Agreement with Mr. Wolfe, which hired him in his capacity as CEO of Crossfield "as

---

[8] Plaintiffs' Statement of Disputed Material Facts ("SDMF") (Doc. 91-27) both responds to Defendants' Statement of Undisputed Material Facts (Doc. 81-93) and contains additional facts which Plaintiffs contend are disputed. Defendants argue that the SDMF also contains inappropriate legal arguments. The Local Rules do not authorize the non-moving party to submit additional uncontested facts. *See* LR 56(b) ("A party opposing summary judgment . . . must provide a separate, concise statement of *disputed* material facts.") (emphasis supplied); *see also Post v. Killington, Ltd.*, 2010 WL 3323737, at *1 (D. Vt. Mar. 23, 2010) ("The Rule does not contemplate the filing of a statement of undisputed facts by the non-moving party."); *Schroeder v. Makita Corp.*, 2006 WL 335680, at *3 (D. Vt. Feb. 13, 2006) ("[T]he Local Rules do not provide an opportunity for the nonmoving party to file a statement of *undisputed* facts at the summary judgment stage.") (emphasis in original). In addition, legal conclusions by either party are "not admissible as factual findings." *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 777 (9th Cir. 2010). In resolving the pending motion, the court will consider Plaintiffs' SDMF to the extent it identifies material disputes and will disregard any improper legal arguments. *See Rotman v. Progressive Ins. Co.*, 955 F. Supp. 2d 272, 276 (D. Vt. 2013) (noting that the court may consider "any additional facts that [are] both integral to the parties' arguments and undisputed").

consultant and Chief Financial Officer (CFO) of the Company [Enochian Denmark] and Chief Financial Officer (CFO) of the Parent Company[,] [Enochian BioSciences]." (Doc. 81-21 at 2.) The agreement was amended on December 29, 2017 to provide Mr. Wolfe with an annual salary of $240,000 and healthcare benefits. It stated that "renumeration is to be discussed with the CEO once a year in December, for the first time in December 2018." *Id.* at 11. Mr. Wolfe and Eric Leire, CEO of Enochian BioSciences, signed the amendment.[9]

The CFO Service Agreement stated that "[t]he appointment is a part[-]time job" and tasked Mr. Wolfe with "[d]evelop[ing] and maintain[ing] systems of internal controls[,]" [m]onitor[ing] banking activities[,]" "[p]reparing and fil[ing] all SEC filings[,]" and "[o]versee[ing] the management and coordination of all fiscal reporting activities[.]" *Id.* at 4. It provided that Mr. Wolfe as CFO "shall owe a duty of confidentiality as regards any confidential information relating to [Enochian Denmark] and its activities received by the CFO as part of his contractual relationship with [Enochian Denmark]." *Id.* at 7.[10] It further stated that "[t]he CFO is not to be entitled to use or disclose confidential information to any third party[,]" and "[t]he duty of confidentiality and the provision barring the use of confidential information are to apply during as well as after the end of the contractual relationship." *Id.* Under the CFO Service Agreement, "[c]onfidential information includes, but is not limited to, any information on [Enochian Denmark's] customers and suppliers, price and discount systems, market surveys and marketing strategies, product development, production processes and research that is not publicly available." *Id.*

The CFO Service Agreement also provided that any dispute "arising out of this

---

[9] Plaintiffs argue that the Confidentiality Agreement pertains only to Enochian Denmark; however, it is undisputed that Mr. Wolfe was employed by Enochian BioSciences as well. It is thus not clear whether the failure to reference both companies in the confidentiality provisions of the CFO Service Agreement was intentional or inadvertent. Mr. Wolfe testified that "[s]etting aside the contract . . . [he] [was] the CFO of Enochian BioSciences[.]" (Doc. 81-81 at 10.)

[10] Mr. Wolfe testified that he "had a duty in Enochian Denmark to protect certain confidential information[.]" *Id.* He also acknowledged that "as the CFO with Enochian BioSciences [he] had a duty to protect its confidential information[.]" *Id.* at 11.

ongoing relationship" or out of the Agreement "is to be settled finally by binding arbitration according to the 'Rules of Arbitration Procedure of Danish Arbitration'" and that both Mr. Wolfe and Enochian Denmark "shall owe a duty of confidentiality as regards the arbitral proceedings and award." *Id.* at 9. In the event Mr. Wolfe left his position as CFO, he "shall return to [Enochian Denmark] any and all material etc. belonging to [Enochian Denmark] and in the CFO's possession." *Id.* at 7.

In 2018, Enochian hired the Waever Group to provide security consulting services. The Waever Group conducted security risk assessments related to Enochian's then-scientific advisor, Serhat Gumrukcu, and his private residence. It provided two reports identifying security risks to Mr. Gumrukcu's personal safety and recommending various security measures to mitigate those concerns. The cover pages of the reports were marked "CONFIDENTIAL" and all subsequent pages contained headers with red text stating: "Confidential material – for DanDrit Biotect USA, Inc & Enochian Biosciences use only" or "Confidential material – for Enochian Biosciences use only[.]" (Docs. 81-13, 81-14.)

After receiving the Waever Group reports, on May 17, 2018, Enochian BioSciences' Board of Directors and Audit Committee approved paying for security services for Mr. Gumrukcu in a special meeting. On or around May 24, 2018, Enochian BioSciences entered into an agreement with the Waever Group (the "Waever Group Agreement") to "ensure the safety of Mr. Gumrukcu[,]" "provide[] . . . security support for Enochian Biosciences Inc[.] and key personnel," and "protect[] IP rights, secure assets and [] protect Enochian Biosciences Inc. as a brand[.]" (Doc. 81-18 at 4.) The Waever Group Agreement was labeled "CONFIDENTIAL" on the cover page and contained confidentiality provisions, including two pages dedicated to confidentiality

terms. *Id.* at 4, 9-11, 13.[11] Pursuant to the Waever Group Agreement, Enochian
BioSciences paid for security costs related to Mr. Gumrukcu's personal protection,
including plainclothes security to accompany him.

        As Enochian's CFO, Mr. Wolfe had access to confidential information including
the companies' financial information and reports, payments to the Waever Group, and the
Waever Group reports. He participated in approving and processing payments to the
Waever Group associated with Mr. Gumrukcu's security costs.

        On December 18, 2018, Mr. Sindlev informed Mr. Wolfe he would be terminated
as CFO. Nine days later, on December 27, 2018, the Enochian BioSciences Board of
Directors voted in favor of his termination. Mr. Gumrukcu was not involved in the
termination decision. Enochian Denmark confirmed the termination in a letter dated
January 9, 2019, which stated that Mr. Wolfe had "certain statutory and contractual
obligations to [Enochian Denmark] related to the disclosure of [Enochian Denmark's]
confidential and trade secret information." (Doc. 81-24 at 41.)

        As the former CFO of Enochian, Mr. Wolfe had access to and knowledge of
confidential information about the companies. After his termination, a dispute arose
between the parties regarding payments Mr. Wolfe sought in connection with his
employment. On February 7, 2019, Mr. Wolfe filed a complaint in a Danish court
alleging, among other claims, that Enochian BioSciences was making annual payments of
$840,000 for Mr. Gumrukcu's personal protection. Prior to filing the complaint, on
February 5, 2019, Mr. Wolfe's counsel emailed Enochian's counsel a draft complaint,
which contained the amount paid for Mr. Gumrukcu's security.

        On February 8 or 9, 2019, Enochian's counsel emailed Plaintiffs and their counsel

---

[11] These confidentiality terms provided that the Waever Group Agreement was "built
on . . . in-depth confidential information sharing between the parties" and that "All information
shared between the parties [is] to be kept strictly confidential and treated as such unless
otherwise agreed." (Doc. 81-18 at 4.) The terms further provided: "All information provided to
[Waever Group] by [Enochian BioSciences] or learned by [Waever Group] while performing
services on behalf of [Enochian BioSciences] (in any form) during the Term of this Agreement,
and the existence of this Agreement, shall be regarded as 'Confidential Information.'" *Id.* at 10.

18

and asserted that the "statement [in the Danish Litigation] concerning payments to Mr. [Gumrukcu] [is] misleading and divulge[s] confidential information" and that Plaintiffs "still possess material that belongs to my clients." (Doc. 81-79 at 51-52.) The letter demanded that Plaintiffs contact Enochian's counsel to discuss procedures for returning the confidential information, immediately dismiss the Danish Litigation, cease and desist from any further disclosures of confidential information, and provide "a full accounting" of the confidential information Plaintiffs had disclosed and to whom. *Id.* at 52. Plaintiffs' counsel responded on February 11, 2019, denying that Plaintiffs had breached their contractual obligations regarding confidentiality, were barred from bringing suit in Danish court, or possessed any of Enochian's "material." *Id.* at 54.

On February 12, 2019, Enochian filed the Underlying Action in Vermont Superior Court in Orange County, Vermont, alleging Mr. Wolfe had disclosed damaging confidential information and that Enochian was at risk for irreparable harm. Enochian sought preliminary injunctive relief on an *ex parte* basis, asking the Vermont Superior Court to enjoin Plaintiffs "from further violating the [CFO Service] Agreement by disclosing its confidential information." (Doc. 81-5 at 9.) The Verified Complaint filed in the Underlying Action was signed by Ms. Puche in her capacity as CFO of Enochian BioSciences. On the same day, Enochian successfully moved to seal portions of the Verified Complaint and their motion for injunctive relief. It subsequently filed a "Statement of Defen[s]e" in the Danish Litigation seeking to dismiss Mr. Wolfe's complaint and asking the Danish court to restrict the disclosure of the complaint and other filed documents to protect the confidential information allegedly contained therein. (Doc. 81-35 at 2.)

The Vermont Superior Court granted Enochian's *ex parte* motion for a temporary restraining order ("TRO") and prohibited Plaintiffs from disclosing certain information. On July 5, 2019, the Vermont Superior Court denied Plaintiffs' March 11, 2019 motion to dismiss. In its July 5, 2019 Entry Order, it found that Enochian "ha[d] raised material issues of fact that those statements and inferences [in the Danish Complaint], if made available to investors and believed as accurate, may raise undue concern with investors,

employees and other investors to [Enochian] disadvantaging [Enochian] in the market place." (Doc. 81-38 at 7.) It stated that "[t]his litigation is pursued to obtain the narrow relief to obtain an ancillary court injunction to maintain the status quo, against disclosure of privileged information, while [the Danish Litigation] go[es] forward." *Id.* at 5.

After a November 5, 2019 hearing on Enochian's preliminary injunction motion, on December 26, 2019 the Vermont Superior Court issued an Entry Order holding that Enochian failed to satisfy the requirements for a preliminary injunction and dissolving the TRO. In January 2020, Plaintiffs filed a second motion to dismiss, which the Vermont Superior Court denied on February 21, 2020. In its February 21, 2020 Entry Order, the court explained that it had denied Enochian's preliminary injunction in part because "Mr. Wolfe was under no express confidentiality agreement as to the U.S. company" and "providing . . . the Danish Complaint to the auditor, and the content of the Danish Complaint, filed under a good faith advice of Danish counsel as necessary to the proceeding, and after advance notice to the Company, breached no fiduciary duty/duty of loyalty." (Doc. 81-41 at 2.)

In March and April 2020, the parties unsuccessfully engaged in settlement negotiations. Plaintiffs served Enochian with written discovery requests. Thereafter, Enochian moved to dismiss the Underlying Action with prejudice on April 17, 2020. On November 17, 2020, the Vermont Superior Court conditionally granted Enochian's motion to dismiss the Underlying Action with prejudice and awarded Plaintiffs costs but not attorney's fees (the "Dismissal Order"). The Dismissal Order analyzed state and federal law to determine "how to terminate [the Underlying Action] when the parties have not agreed to a Rule 41(a)(1)(ii) stipulation to a dismissal with prejudice." (Doc. 81-45 at 3.)

The Dismissal Order stated:

> To the extent the [Plaintiffs] might later pursue a malicious prosecution action, the dismissal with prejudice order adjudicates the merits in [Plaintiffs'] favor, which may well be relevant to and/or possibly establish the "without probable cause" and/or termination of the proceedings in claimant's favor elements of such a subsequent action (on which points the

20

court expresses no opinion).

*Id.* at 6.

The Dismissal Order further stated: "It is a key point that [Enochian's] voluntary dismissal with prejudice not only dismisses all three counts in the Amended Complaint but serves as a final adjudication of those claims in [Plaintiffs'] favor." *Id.* at 5.

The Dismissal Order also analyzed the issue of costs and attorney's fees in light of Vermont Supreme Court and Second Circuit precedent. The Order noted that "the grant of the [Enochian's] motion for voluntary dismissal with prejudice[] provides a determination on the merits (like success at trial or on a case-dispositive motion) such that [Plaintiffs] are then entitled to entry of a judgment in their favor and to seek recovery of their Rule 54 costs." *Id.* at 7. Although Enochian "failed to date to establish their claims for injunctive relief, . . . that shortcoming does not establish that their conduct was vexatious, wanton, oppressive, or unreasonably obstinate." *Id.* Plaintiffs "articulate what may be permissible inferences as to what they think may have motivated [Enochian's] pursuit of this action and conduct, but that does not establish sufficient facts to show bad faith for purposes of [costs and attorney's fees]." *Id.* at 8.

On December 14, 2020, the Vermont Superior Court issued a one-page Order Approving Costs and Final Order of Dismissal with Prejudice, which awarded Plaintiffs $1,657.44 in costs pursuant to V.R. Civ. P. 54(d)(1). When the Underlying Action was dismissed, no final merits hearing had been held. The December 14, 2020 Order referred to the court's earlier Orders and contained no additional findings of fact or legal analysis.

On April 20, 2022, Plaintiffs withdrew the Danish Litigation to bring the case before an arbitrator. The Danish court found that because Plaintiffs withdrew the case after it had been scheduled for a one-day hearing, Plaintiffs were the unsuccessful parties regardless of their reasons for withdrawal. It ordered Plaintiffs to pay DKK 80,000 in costs to Enochian Denmark within fourteen days. Plaintiffs have not done so, pursuant to the advice of their Danish counsel.

Until Mr. Wolfe researched Mr. Gumrukcu after his termination, he was unaware of any felony charges against him and he did not raise the issue of Mr. Gumrukcu's

21

criminal history with anyone at Enochian. Enochian BioSciences continued paying for Mr. Gumrukcu's security throughout the pendency of the Underlying Action.

On April 9, 2019, Plaintiffs submitted a claim to Enochian's insurer, AIG Insurance Co., for their legal fees incurred in the Underlying Action. AIG ultimately paid for or reimbursed $209,484.92 of Plaintiffs' legal fees related to the Underlying Action. Mr. Wolfe personally received $17,500.

After his termination from the CFO position, Mr. Wolfe applied for jobs posted on Indeed.com and worked with the recruiting companies Robert Half and Russell Reynolds. At least some of the jobs for which Mr. Wolfe applied offered lower salaries than he earned as CFO for Enochian. Mr. Wolfe's job search was unsuccessful. He has not, however, identified any employers that rejected his application because of the Underlying Action. Mr. Wolfe last applied for a job in May 2020.

Plaintiffs seek damages of $43,000,000, including approximately $26,000,000 for fifteen years of lost wages for Mr. Wolfe, $16,000,000 in revenue lost by Crossfield, $230,000 in legal fees related to the Underlying Action, $132,000 for the time Mr. Wolfe spent defending the Underlying Action, reputational damages, legal fees incurred in the pending action, and punitive damages in an amount to be determined by the court.[12]

The amount of lost wages claimed by Mr. Wolfe is based on an "industry average annual salary of $2,087,388," an amount drawn from a BDO report focused on "companies with annual revenues between $100 million and $3 billion." (Doc. 91-27 at 73, ¶ 88) (alterations adopted) (internal quotation marks omitted). The parties agree that Enochian's annual revenues did not fall within this range when Mr. Wolfe was CFO from 2017 to 2019.[13] Mr. Wolfe testified that the amount of lost revenue and reputational

---

[12] Mr. Wolfe asserts he spent "in excess of 1,040 hours defending his name." (Doc. 1 at 6, ¶ 47.) He did not maintain logs of this time.

[13] Mr. Wolfe was previously employed as Enochian's CFO for a period that ended in April 2015. He testified that Enochian had revenue during his first tenure as CFO but not his second:

> Q. Did they ever have any revenues while you were a CFO of Enochian?
>
> A. In Denmark in the first round. Yes.

damages Plaintiffs seek is based on his "personal opinion" that the Underlying Action "tarnished Crossfield's reputation." (Doc. 81-81 at 6, 43.) He further testified that Plaintiffs sought to engage an expert to testify "as to the veracity of the damages" and Plaintiffs' reputational damages would be "solely based off expert testimony[.]" *Id.* at 33, 43.

### III.   Disputed Facts.

Defendants assert their decision to terminate Mr. Wolfe as CFO was made for several reasons, including a desire to have a full-time, non-consultant CFO after they became publicly listed by Nasdaq in December 2018; Mr. Wolfe's performance did not meet their expectations; and a desire for a CFO who was geographically closer to the Audit Committee's chair and its outside corporate counsel. Plaintiffs contend that these reasons were pretextual and that the real reason was that Mr. Wolfe had raised concerns about Mr. Gumrukcu and "the propriety of the company's payment of security costs and other actions and expenses for or related to [Mr.] Gumrukcu." (Doc. 91-27 at 18, ¶ 25.) As this is not a wrongful termination lawsuit, the reasons for Mr. Wolfe's termination are relevant only to the issue of malice.

Defendants assert that they "closely manage[] and restrict[] access" to confidential information, including requiring executives, employees, and contractors to keep information confidential; restricting access to physical space, including laboratories; and restricting access to computer systems. (Doc. 81-92 at 8.) In support of the Underlying

---

. . .

Q. How much was that for?

A. If I recall correctly, 350,000 or so. Around 350,000 U.S. dollars.

Q. All right. So apart from that, can you remember any other revenues that Enochian had during your tenure as CFO?

A. No.

Q. During your tenure at Enochian[,] did Enochian have losses each quarter?

A. Yes.

(Doc. 81-81 at 46-47.)

Action, Ms. Puche averred:

> As a publicly[]traded company in a cutting-edge scientific field, keeping
> confidential, non-public information confidential is [of] the utmost
> importance to Enochian and its continued success. Moreover, decisions
> regarding the disclosure of information are highly regulated and very
> deliberate. . . . If any of Enochian's confidential, non-public information
> were to become public–whether "administrative" or non-administrative"
> confidential information–it could seriously harm Enochian and its
> competitive advantage in this highly competitive market.

(Doc. 81-82 at 5.) Plaintiffs counter that Ms. Puche's description of Defendants' current
confidentiality measures may not accurately depict the measures in place in February
2019. They assert Mr. Wolfe received emails containing confidential information about
vendor agreements from Defendants after his employment ended.

Mr. Wolfe testified that after another employee was terminated following a dispute
with Mr. Gumrukcu, Enochian BioSciences' former CEO Mr. Leire told him that
"anybody that crosses [Mr.] Gumrukcu will be terminated." (Doc. 91-39 at 10.)
Defendants contend that Plaintiffs sought information regarding the timing and manner of
the payments for Mr. Gumrukcu's security but point to Mr. Sindlev's testimony that Mr.
Wolfe did not raise concerns about Mr. Gumrukcu while he was employed as CFO. The
parties disagree as to whether Mr. Wolfe attended the Audit Committee meeting during
which the security payments were approved. Mr. Wolfe testified that the board authorized
Enochian to make the security payments after he refused to do so.

The parties also disagree whether Enochian BioSciences' payment for Mr.
Gumrukcu's personal security and the amount paid was confidential information.
Plaintiffs argue that this information had been previously disclosed in Enochian
BioSciences' SEC filings,[14] that Mr. Gumrukcu's security detail was not so

---

[14] The SEC filings in question state: "The increase in general and administrative expenses is
primarily due to the costs related to additional security expenses of $263,447" (Doc. 81-24 at 66)
and "The net cash used by operating activities consisted primarily [of] . . . $263,000 in security
expenses[.]" *Id.* at 67. The filings also explain Enochian's consulting agreement with Mr.
Gumrukcu's company G-Tech:

inconspicuous as to not be noticed by the public, and that in May 2020 Mr. Sindlev confirmed the security arrangement in an email with a member of the media included as a recipient. They contend that individuals who were not employees or officers of Enochian BioSciences, Enochian Denmark, and the Waever Group were aware of the security arrangement, including Michael Mendicino, Gregory Howell, and Enochian shareholder Ole Abildgaard. They claim Mr. Abildgaard was included in correspondence with the security provider and corresponded with Defendants about the security arrangements. Plaintiffs point out that Defendants failed to object to the statement regarding Mr. Gumrukcu's security when Plaintiffs shared a draft complaint with them prior to filing the Danish Litigation and did not move to seal the Danish Litigation.

Defendants assert that according to Mr. Sindlev, an Enochian board member, Henrik Grønfeldt-Sørensen, received a call from Mr. Wolfe's "friend and [] business associate" Jens Sejerøe-Olsen, "who threatened Henrik to reveal public information if we didn't settle with [Mr. Wolfe] and pay all the money to his account." (Doc. 81-80 at 11.) Mr. Sindlev testified that Defendants were concerned about Mr. Sejerøe-Olsen's "threat[]" that if they did not "pay an amount up front to his escrow account . . . , Robert Wolfe would consider to not stick to his Confidentiality Agreement." *Id.* at 15. In response, Plaintiffs cite a Declaration signed by Mr. Sejerøe-Olsen stating that he:

> did not make any statements or threats, whether on behalf of [Plaintiffs] or in any other capacity, to anyone affiliated with or representing Enochian BioSciences, Inc. and/or Enochian BioSciences Denmark ApS (including but not limited to Rene Sindlev or Henrik Grønfeldt-Sørensen) that I[] [or Plaintiffs] would reveal Enochian['s] confidential information if Enochian did not settle with [Plaintiffs] and pay all of the money owed to them for their services as CFO.

---

> On July 9, 2018, [Enochian BioSciences] entered into a consulting agreement with G-Tech to assist [Enochian BioSciences] with the development of the gene therapy and autologous and allogenic cell therapy modalities . . . . G-Tech is entitled to consulting fees for 20 months, with a monthly consulting fee of not greater than $130,000 per month. G-Tech is controlled by certain members of Weird Science.

*Id.* at 65. The SEC filings do not disclose the reason for the additional security expenditures.

(Doc. 91-38 at 2-3, ¶ 4.)

Citing sworn statements by Ms. Puche and Mr. Sindlev, Defendants contend that Plaintiffs' disclosure of the security information in their Danish Complaint put Mr. Gumrukcu's security at risk and disadvantaged Enochian in the marketplace by providing competitors with insight into their spending. Plaintiffs object to these statements as speculative and note that, according to the Waever Group reports and Mr. Sindlev's deposition testimony, Mr. Gumrukcu was at risk before Plaintiffs disclosed any information regarding his security arrangements.

In June 2019, the Waever Group prepared a "Due Diligence Report" with information about Mr. Wolfe. The parties dispute whether the report was commissioned by Mr. Abildgaard without Defendants' knowledge, as Defendants assert, or with it, as Plaintiffs contend. Plaintiffs' attorney Mr. Sejerøe-Olsen averred in a Declaration dated January 3, 2023 that in June 2020 Mr. Abildgaard contacted him and informed him that Defendants had asked the Waever Group to prepare the report "in connection with the ongoing conflict between the parties." *Id.* at 3, ¶ 5. Mr. Sejerøe-Olsen averred that Mr. Abildgaard provided him with copies of the Due Diligence Report and of a separate "Forensic Report" and informed him in a phone conversation "that Mr. Wolfe would be seriously damaged and would never be able to get another job as a CFO should these reports be distributed." *Id.*

Defendants contend that "[t]he purpose of the [Underlying] Action was to protect Enochian's confidential information, and not to cause reputation[al], economic, or other harm to Plaintiffs, or to gain some type of 'leverage' in the Danish [Litigation]." (Doc. 91-27 at 38, ¶ 52.) They cite deposition testimony from Mr. Wolfe acknowledging that he does not have any documents or emails from Defendants "conced[ing]" that their motives were to harm him, and that Defendants did not expressly state they were trying to harm his professional reputation. *See* Doc. 81-81 at 38 ("Q. Are you aware of . . . anyone from Enochian ever saying that Enochian was trying to harm your reputation? A. No. Q. Do you have any documents stating that Enochian was intentionally trying to harm your reputation? A. I may have emails about discussions of it. I don't recall a specific one.").

26

Defendants cite testimony from Mr. Sindlev stating that Defendants did not harbor ill will towards Mr. Wolfe.

Plaintiffs, in contrast, assert Enochian's stated reason for bringing the Underlying Action was pretextual because Plaintiffs had not disclosed any confidential information. They cite Mr. Sindlev's initial deposition testimony that he "[could] not tell you if there [were] any concerns" about the Danish Litigation, although Mr. Sindlev later testified that the Underlying Action was filed because after Mr. Sejerøe-Olsen's alleged "threat[]" Enochian "didn't want . . . confidential information to be public." (Doc. 91-30 at 8-9.)

Plaintiffs contend that Enochian's dismissal of the Underlying Action reveals it lacked probable cause and was initiated in bad faith. Defendants counter that their decision to voluntarily dismiss the Underlying Action was motivated by their concerns about the costs of continuing litigation in light of the uncertain business environment caused by the COVID-19 pandemic and the significant resources expended on the litigation to date, as well as because a settlement appeared unlikely. Plaintiffs point to Mr. Sindlev's deposition testimony that when Enochian filed the Underlying Action, it was motivated by the Danish press, who were "jumping on a lot of issues with shorters" and "jumping on all information, twisting and manipulating the information to an extent, and actually had an influence on the share price." *Id.* at 4-5. When Enochian moved to dismiss, "we had more investors than shorters to pick up the shorters' shares. So we were less vulnerable if information came out. And we had made a statement in the first part, so we didn't need to keep up and continue that." *Id.* at 15-16. Mr. Wolfe testified that Mr. Leire told him that Enochian was attempting to bankrupt him through the Underlying Action. Plaintiffs also note that Enochian moved to dismiss five days before its responses to Plaintiffs' written discovery requests were due. They contend these facts are relevant to the issue of whether probable cause existed to file the Underlying Action.

## IV.  Conclusions of Law and Analysis.

### A.    Standard of Review.

The court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the non-moving party" and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (internal quotation marks omitted). There is no genuine dispute where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "Once the moving party demonstrates that there are no genuine issues of material fact, the nonmoving party must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (alteration in original) (internal quotation marks omitted). "Thus, a nonmoving party can defeat a summary judgment motion only by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Id.* at 166-67 (alterations in original) (internal quotation marks omitted). "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita*, 475 U.S. at 586).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to

28

any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Kaytor*, 609 F.3d at 545 (internal quotation marks and emphasis omitted).

Not all factual disputes are material. The summary judgment "standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.] . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). However, if the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Id.* at 251-52.

## B.    Whether Plaintiffs' Claim for Malicious Prosecution Fails as a Matter of Law.

"Vermont follows the Restatement (Second) of Torts for malicious prosecution actions." *Bentley v. Northshore Dev., Inc.*, 935 F. Supp. 500, 504 (D. Vt. 1996) (citing *Chittenden Tr. Co. v. Marshall*, 507 A.2d 965 (Vt. 1986); *Anello v. Vinci*, 458 A.2d 1117 (Vt. 1983)). To prevail on a malicious prosecution claim, a plaintiff "must prove that [the] defendant initiated or continued the case [1] without probable cause, [2] that [the] defendant acted with malice, and [3] that the earlier case terminated in [the] plaintiff's favor[]." *Bacon v. Reimer & Braunstein, LLP*, 2007 VT 57, ¶ 4, 182 Vt. 553, 554, 929 A.2d 723, 725 (citing *Anello*, 458 A.2d at 1119). He or she must also "show that he [or she] suffered damages as a result of the prior proceeding." *Chittenden Tr. Co.*, 507 A.2d at 969 (Vt. 1986).

Defendants contend that Plaintiffs have not proffered admissible evidence with regard to each essential element of their claim. Plaintiffs argue that material factual disputes preclude reaching this determination on summary judgment.

29

## 1.   Whether Enochian Lacked Probable Cause to File the Underlying Action.

A lack of probable cause requires a party to establish that "there was no objectively reasonable basis to bring the action." *Bacon*, 2007 VT 57, ¶ 6, 182 Vt. at 555, 929 A.2d at 726 (citing, *inter alia*, W. Keeton, Prosser & Keeton on the Law of Torts § 120, at 893-94 (5th ed. 1984) (noting probable cause standard in civil actions merely requires that facts and law would support a "reasonable chance" of prevailing on the claim) (internal quotation marks omitted)). "'Given that a lack of probable cause is a necessary element for malicious prosecution,' the existence of probable cause is a complete defense to a claim of malicious prosecution as well." *Simuro v. Shedd*, 176 F. Supp. 3d 358, 376 (D. Vt. 2016) (quoting *Lay v. Pettengill*, 2011 VT 127, ¶ 31, 191 Vt. 141, 159, 38 A.3d 1139, 1151).

Plaintiffs' malicious prosecution claim arises from the Underlying Action in which Enochian asserted claims for breach of the CFO Service Agreement, breach of fiduciary duty, and breach of duty of loyalty. To establish that the Underlying Action lacked probable cause, Plaintiffs must demonstrate that Enochian had "no objectively reasonable basis" to file it. *Bacon*, 2007 VT 57, ¶ 6, 182 Vt. at 555, 929 A.2d at 726. Although Plaintiffs point to subsequent events that call into question Enochian's motives in filing the Underlying Action, it remains true that Plaintiffs had contractual and fiduciary duties not to disclose confidential information in contravention of Enochian's interests. *See Vt. Dep't of Pub. Serv. v. Mass. Mun. Wholesale Elec. Co.*, 558 A.2d 215, 224 (Vt. 1988) ("Directors of a corporation are regarded as fiduciaries and are required to exercise their own independent judgment for the highest welfare of the corporation and its

stockholders.") (internal quotation marks omitted).[15] The issue thus turns on whether it was objectively reasonable for Enochian to believe Plaintiffs retained confidential information and had disseminated it or intended to do so.

The CFO Service Agreement is governed by Danish law and bars Plaintiffs from disclosing confidential information regarding Enochian Denmark during or after Mr. Wolfe's employment as CFO. Under Danish law, a breach of contract occurs when there is a "[f]ailure to perform a claim that is not attributable to the creditor's circumstances[.]" (Doc. 81-66 at 4.) The CFO Service Agreement defines "confidential information" as "include[ing], but [] not limited to, any information on [Enochian Denmark's] customers and suppliers, price and discount systems, market surveys and marketing strategies, product development, [and] production processes and research that is not publicly available." (Doc. 81-21 at 7.) The contractual duty of confidentiality imposed by the CFO Service Agreement extended beyond Mr. Wolfe's term of employment. *See id.* at 7 ("The duty of confidentiality and the provision barring the use of confidential information are to apply during as well as after the end of the contractual relationship.).

Enochian's breach of fiduciary duty and duty of loyalty claims in the Underlying Action were governed by Vermont law, which requires them to show that (1) Plaintiffs owed them a fiduciary duty which (2) "required [Plaintiffs] to act in good faith and with loyalty for the advancement of [Enochian's] interests." *J.A. Morrissey, Inc. v. Smejkal*, 2010 VT 66, ¶ 10, 188 Vt. 245, 252, 6 A.3d 701, 706. "In Vermont, a corporate director must discharge his or her duties: '(1) in good faith; (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner

---

[15] *See also Est. of Kuhling by Kuhling v. Glaze*, 2018 VT 75 ¶ 18 n.5, 208 Vt. 273, 283, 196 A.3d 1125, 1131 ("For a fiduciary duty to arise, 'the relationship had to ripen into one in which [one party was] dependent on, and *reposed trust and confidence in*, [another party] in the conduct of their affairs.'") (alterations in original) (emphasis supplied) (quoting *Cap. Impact Corp. v. Munro*, 162 Vt. 6, 10, 642 A.2d 1175, 1177 (1992)); *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 10 (2d Cir. 1983) (observing in securities fraud action that "[i]t is well settled that traditional corporate 'insiders'—directors, officers and persons who have access to confidential corporate information — must preserve the confidentiality of nonpublic information that belongs to and emanates from the corporation") (footnote omitted).

the director reasonably believes to be in the best interests of the corporation.'" *Id.* (quoting 11A V.S.A. § 8.30(a)(1)-(3)).

"The duties of good faith and loyalty require that a director must not allow personal interests to interfere with or supersede the interests of the corporation." *Id.* A corporate officer's fiduciary duties include a duty of confidentiality. *See Carpenter v. United States*, 484 U.S. 19, 27 (1987) ("[E]ven in the absence of a written contract, an employee has a fiduciary obligation to protect confidential information obtained during the course of his employment.") (internal quotation marks omitted); *Nashef v. AADCO Med., Inc.*, 947 F. Supp. 2d 413, 420 (D. Vt. 2013) (finding that Vermont law allows an employer to "bring a claim against a current or former employee for breach of a duty to refrain from disclosing confidential information"). Mr. Wolfe concedes that, as Enochian's CFO, he had a duty to protect the companies' confidential information.

If information disclosed by Plaintiffs was not confidential, Enochian lacked an objectively reasonable basis to bring the Underlying Action. The parties agree that Plaintiffs had access to and knowledge of confidential information regarding Enochian. They dispute, however, whether Plaintiffs publicly disclosed confidential information and whether the disclosure was a breach of contract or fiduciary duty. Plaintiffs argue that the fact that Enochian BioSciences paid for Mr. Gumrukcu's personal security and the amount that it paid for his security services was already publicly available information before Plaintiffs initiated the Danish Litigation. They contend that this information was available to individuals outside of Enochian, that the security team was observable in public, that information regarding security expenses was disclosed in SEC filings, and that Enochian's counsel did not object to the information's disclosure after they saw a draft complaint before the Danish Litigation was filed.

Defendants argue the evidence does not establish that the disclosed information was publicly available. Even if pieces of evidence are considered in the aggregate, they contend no member of the public could discover the amount Enochian BioSciences paid for personal protection for Mr. Gumrukcu. They further argue that the non-employees privy to that information were affiliated with Enochian BioSciences or Mr. Gumrukcu

32

and were not members of the general public. Similarly, the presence of an individual in plain clothes near Mr. Gumrukcu did not reveal the nature of the security arrangement and the SEC filings' references to "security" expenses do not identify Mr. Gumrukcu.

Although Plaintiffs cite no evidence showing that Enochian BioSciences' annual payments of $840,000 for Mr. Gumrukcu's personal protection were publicly disclosed prior to the Danish Litigation, they have produced sufficient evidence to establish a disputed issue of fact regarding whether this information was no longer deemed confidential by Defendants and was known to individuals outside the company. Plaintiffs disclosed their intent to reveal this information by sending Defendants a draft complaint in the Danish Litigation, and Defendants allegedly did not protest that disclosure. *See Proctor v. LeClaire*, 846 F.3d 597, 607-08 (2d Cir. 2017) (observing that when reviewing a motion for summary judgment, "[i]n reviewing the evidence and the inferences that may reasonably be drawn, [we] may not make credibility determinations or weigh the evidence") (second alteration in original) (internal quotation marks omitted). Defendants, in contrast, claim they timely objected to Plaintiffs' use of any confidential information.

A factual dispute also exists regarding whether Enochian reasonably believed that it was "threatened with further harm" because Plaintiffs' associate Mr. Sejerøe-Olsen threatened that Mr. Wolfe would disclose additional confidential information if he did not receive certain payments. (Doc. 81-93 at 20, ¶ 53.) The parties further disagree regarding the proper interpretation of Plaintiffs' counsel's response to the February 8, 2019 cease and desist letter from Enochian's counsel. While Plaintiffs maintain that their response was substantive and indicated that there was no risk of future disclosures, Defendants argue that Plaintiffs did not confirm that they would cease disclosing confidential information.

If Enochian did not reasonably believe the security information was confidential or at risk of future disclosure, the Underlying Action was arguably based on "misleading, fabricated, or otherwise improper evidence" and therefore lacked probable cause. *Lay*, 2011 VT 127, ¶ 22, 191 Vt. at 153, 38 A.3d at 1147 (collecting cases). Because the court cannot make this determination as a matter of law, summary judgment is not available on

this basis. A genuine dispute of material fact exists regarding whether the Underlying
Action lacked probable cause when filed.

### 2. Whether Enochian Acted with Malice in Bringing the Underlying Action.

"The malice element of a malicious prosecution claim requires a showing that the
baseless suit was instituted from any improper and wrongful motive." *Chittenden Tr. Co.*,
507 A.2d at 970 (internal quotation marks omitted). "[M]alice may be inferred from
proof of a lack of probable cause." *Id.* (citing *N. Oil Co. v. Socony Mobil Oil Co.*, 347
F.2d 81, 84 (2d Cir. 1965); *Ryan v. Orient Ins. Co.*, 119 A. 423, 425 (Vt. 1923).

Plaintiffs argue that Enochian's malice in filing the Underlying Action may be
inferred from the lack of probable cause supporting that action, the timing of the
Underlying Action, the fact that Enochian sought a TRO in the Underlying Action on an
*ex parte* basis, and Enochian's various rationales for why it brought the Underlying
Action then voluntarily dismissed it. Plaintiffs assert that Enochian filed the Underlying
Action to cause them reputational and economic harm and to "to gain leverage" in the
Danish Litigation. (Doc. 43-1 at 4-5, ¶¶ 28, 40.) If proven, both are "improper and
wrongful motive[s]." *Chittenden Tr. Co.*, 507 A.2d at 970 (internal quotation marks
omitted). Defendants contend that Plaintiffs fail to assert any evidence of malice
independent of their allegations relating to probable cause.

Certain disputes between the parties are not material. For example, no malice may
be inferred merely because of the procedural mechanism Enochian used to advance their
claims in the Underlying Action. As this court held in its Opinion and Order granting in
part and denying in part Defendants' motions to dismiss:

> Vermont law allows a TRO to be issued "without written or oral notice to
> the adverse party or that party's attorney" when, as in the Underlying
> Action, an application is supported by an affidavit or verified complaint.
> *See* Vt. R. Civ. P. 65(a). There was no procedural violation in Defendants'
> manner of filing.

*Wolfe v. Enochian BioSciences Denmark ApS*, 2022 WL 656747, at \*10 (D. Vt. Mar. 3,
2022).

With regard to Plaintiffs' arguments of malice regarding the timing of Enochian's

filing of the Underlying Action and subsequent motion to dismiss, suspect timing may support a finding of malice in a malicious prosecution action. *See, e.g.*, *Niebur v. Town of Cicero*, 212 F. Supp. 2d 790, 815 (N.D. Ill. 2002) ("The jury might also have found malice from the suspicious timing of [defendant's] action[.]"). Although Plaintiffs question why Enochian waited to file the Underlying Action on February 11, 2019 if they were in fact threatened by Mr. Sejerøe-Olsen in January 2019, Enochian filed the Underlying Action only four days after Plaintiffs filed the Danish Litigation on February 7, 2019 and approximately one month after the alleged threat. A rational jury could conclude that this does not constitute unreasonable delay and that the timing of the Underlying Action was not suspicious.

Plaintiffs also question why Enochian "suddenly" moved for dismissal soon after engaging in settlement negotiations and after Plaintiffs served written discovery. (Doc. 91-26 at 15.) Their only support for this argument, however, is Enochian's insistence on discovery in February 2020 and the failure of settlement negotiations. Plaintiffs do not claim discovery would be atypical if settlement negotiations failed. They also do not deny a global pandemic was underway. The record therefore does not support an inference of malice solely based on timing.

Plaintiffs contend that Mr. Sindlev's testimony shows that Enochian's rationale for dismissing the Underlying Action was inconsistent and pretextual because Mr. Sindlev testified that Enochian moved to dismiss the Underlying Action in April 2020 as Enochian was "less vulnerable if information came out" and "had made a statement in the first part, so [it] didn't need to keep up and continue that." (Doc. 91-30 at 15-16.) He also testified that Enochian's concerns about further disclosures had "faded . . . [b]ecause [Mr. Wolfe] was still bound by his Confidentiality Agreement he signed." *Id.* at 13. This rationale allegedly conflicts with Enochian's stated concerns that Plaintiffs would continue to violate their confidentiality obligations. A reasonable jury could find that Mr. Sindlev's statements support a finding that Enochian initiated the Underlying Action based on an "improper and wrongful motive." *Chittenden Tr. Co.*, 507 A.2d at 970 (internal quotation marks omitted). A reasonable jury could also find that they do not.

35

"Without doubt, issues involving a determination as to an individual's state of mind or credibility make poor subjects for summary judgment." *Tveraas v. Coffey*, 818 F. Supp. 75, 79 (D. Vt. 1993). Under Vermont law, a jury must generally decide whether a defendant acted with malice. *See Cook v. Nelson*, 712 A.2d 382, 385 (Vt. 1998) ("[T]he jury must find that defendant acted with malice[.]"); *see also DeYoung v. Ruggiero*, 2009 VT 9, ¶ 24 n.2, 185 Vt. 267, 277, 971 A.2d 627, 635 (observing that in punitive damages context the "the jury ordinarily makes th[e] determination" of "whether malice exists as a question of fact"). Defendants have failed to establish they are entitled to summary judgment due to a lack of malice as a matter of law.

### 3. Whether the Underlying Action Terminated in Plaintiffs' Favor.

"In determining whether a prosecution terminated favorably for the purpose of a malicious prosecution claim, both the Second Circuit and the Vermont Supreme Court have adopted the approach of the Restatement (Second) of Torts." *Simuro*, 176 F. Supp. 3d at 380 (citing *Janetka v. Dabe*, 892 F.2d 187, 189-90 (2d Cir. 1989); *Siliski v. Allstate Ins. Co.*, 811 A.2d 148, 151 (Vt. 2002)); *see also McDonough v. Smith*, 139 S. Ct. 2149, 2156 (2019) ("[T]he common-law tort of malicious prosecution [is] a type of claim that accrues only once the underlying criminal proceedings have resolved in the plaintiff's favor.").

> Pursuant to that approach, "if the manner of termination, including dismissal, reflects negatively on the merits of the case, it will be considered favorable to the defendant." *Siliski*, 811 A.2d at 151. By contrast, "if the reason for dismissal is not inconsistent with a defendant's wrongdoing, it will not be considered a favorable termination." *Id.* at 152. "If the circumstances surrounding dismissal are ambiguous on this point, the determination should be left for trial." *Id.*; *see also Janetka*, 892 F.2d at 189 ("When a termination is indecisive because it does not address the merits of the charge, the facts surrounding the termination must be examined to determine whether the failure to proceed implies a lack of reasonable grounds for the prosecution.").

*Simuro*, 176 F. Supp. 3d at 380-81.

In its Dismissal Order, the Vermont Superior Court held that "to the extent the [Plaintiffs] might later pursue a malicious prosecution action, the dismissal with prejudice

order adjudicates the merits in [Plaintiffs'] favor[.]" (Doc. 81-45 at 6.) In that same
Order, however, the court declined to rule on whether the dismissal established the
"termination of the proceedings in claimant's favor element[]" of a malicious prosecution
claim. *See id.* (noting that with regard to the probable cause or favorable termination
elements of a possible malicious prosecution action, "the court expresses no opinion").
While noting that the "automatic merits adjudication" resulted from Enochian's
"voluntary and final concession to forgo any pursuit of their claims," the court also
observed the parties were contemporaneously involved in the Danish Litigation, that
there was no final hearing, and that the dismissal reflected no ruling on whether Plaintiffs
had "established sufficient facts and law for adjudication of all of the counts in [their]
favor." *Id.* Both parties use these conflicting statements to support their competing
characterizations of the outcome of the Underlying Action.

Defendants contend that because Enochian moved to dismiss the Underlying
Action due to the "difficult business environment caused by the COVID-19 pandemic[,]"
the significant time it had already spent litigating the matter, and Plaintiffs' unwillingness
to enter into a settlement agreement, their reasons for dismissing the case were unrelated
to Plaintiffs' innocence and thus the termination was not favorable to Plaintiffs. (Doc.
81-92 at 24.) They note that the Underlying Action was dismissed without discovery,
summary judgment motions, or a final merits hearing.

Plaintiffs argue that Defendants' proffered reasons for dismissing the suit are
pretextual in light of Mr. Sindlev's deposition testimony that Defendants had already
made a "statement" when Enochian decided to dismiss the case. (Doc. 91-30 at 16.) They
note that Enochian's dismissal motion was filed only days before Enochian's discovery
responses were due. In support, they cite the Vermont Superior Court's award of costs
under Vt. R. Civ. P. 54(d)(1) and its conclusions that the voluntary dismissal with
prejudice "not only dismisses all three counts in the Amended Complaint but serves as a
final adjudication of those claims in [Plaintiffs'] favor" and that it "provides a
determination on the merits (like success at trial or on a case-dispositive motion) such
that [Plaintiffs] are then entitled to entry of a judgment in their favor and to seek recovery

of their Rule 54 costs." Doc. 81-45 at 5, 7; *see also* Vt. R. Civ. P. 54(d)(1) ("Costs other than attorneys' fees shall be allowed as of course to the prevailing party[.]"). They also point out Enochian dismissed the case with prejudice. *Cf. Siliski*, 811 A.2d at 152 (finding dismissal without prejudice was not favorable to plaintiffs where defendant sought to preserve their ability to refile and did not "evince an intent . . . to wholly abandon her claim").

The award of costs to Plaintiffs as the "prevailing party" under Vt. R. Civ. P. 54(d)(1) may have been a result of the court's procedural judgment that the dismissal served as a final adjudication of the Underlying Action. The court made no findings that Enochian had engaged in wrongdoing or that the Underlying Action was not filed with probable cause. In *Chittenden Tr. Co. v. Marshall*, the Vermont Supreme Court held that when whether a prior proceeding terminated in favor in the plaintiff was not clear, the issue must be submitted to the jury. 507 A.2d at 970 ("Where there is no factual dispute on the issue, the question of a favorable termination may be ruled on by the court as a matter of law; but where there is a dispute, it is for the jury to determine the circumstances under which the prior proceedings were terminated.").

Here, there are genuine issues of material fact and inconsistent statements by the Vermont Superior Court so that the issue of whether the Underlying Action was resolved in Plaintiffs' favor "should be left for trial[.]" *Siliski*, 811 A.2d at 151.[16] Defendants are thus not entitled to summary judgment in their favor on this basis.

### 4. Whether Plaintiffs Suffered Damages Due to the Underlying Action.

A plaintiff asserting a malicious prosecution claim "must show that he suffered damages as a result of the prior proceeding." *Chittenden Tr. Co.*, 507 A.2d at 969; *see also Smith v. Parrott*, 2003 VT 64, ¶ 12, 175 Vt. 375, 380-81, 833 A.2d 843, 848

---

[16] A jury is capable of resolving the factual disputes surrounding "the circumstances under which the prior proceedings were terminated[,]" such as Enochian's motivations for seeking dismissal. *Chittenden Tr. Co. v. Marshall*, 507 A.2d 965, 970 (Vt. 1986) (holding jury should have been asked to determine whether plaintiff had sought dismissal because its claim had been satisfied through another means or because it lacked probable cause).

("Where—as in Vermont—the plaintiff must prove that as a result of the defendant's conduct the injuries would not otherwise have been incurred, an act or omission of the defendant *cannot* be considered a cause of the plaintiff's injury if the injury would probably have occurred without it.") (emphasis in original) (internal quotation marks and citation omitted). For tort claims, plaintiffs must prove damages with "reasonable certainty." *Gettis v. Green Mountain Econ. Dev. Corp.*, 2005 VT 117, ¶ 33, 179 Vt. 117, 129, 892 A.2d 162, 172. "Consequences which are contingent, speculative, or merely possible are not included." *Id.* (alteration adopted) (internal quotation marks omitted). Defendants assert that Plaintiffs have failed to prove the Underlying Action caused their alleged damages.

Plaintiffs provide an estimate of the lost wages or revenue they experienced or will experience due to the Underlying Action.[17] Although they rely on an "industry average annual salary of $2,087,388," an amount derived from a publicly available report focused on "companies with annual revenues between $100 million and $3 billion," (Doc. 91-27 at 73, ¶ 88-89) (alterations adopted) (internal quotations omitted), they present no evidence regarding why this is an appropriate source for lost wages data in this case or how this accurately estimates their lost wages. Notably, this annual salary amount far exceeds the estimate proffered by Plaintiffs' expert Mr. Ketchum.

Although Plaintiffs seek more than $1,000,000 in lost annual revenue for

---

[17] Mr. Ketchum testified that he was unable to provide a causation opinion regarding Plaintiffs' damages:

> Q. Are you aware of any employers who decided not to hire Mr[.] Wolfe because of allegations that he disclosed Enochian confidential information?
>
> A. No.
>
> Q. You aren't able to say that Mr. Wolfe hasn't been able to get a new job because of allegations that he disclosed Enochian confidential information, correct?
>
> A. I can't say if he has or if he hasn't.
>
> Q. Right. You don't . . . know one way or the other?
>
> A. That's correct.

(Doc. 82-3 at 11.)

Crossfield, they do not dispute that in the past thirty years Crossfield has never had annual revenue of greater than $1,000,000 and do not cite an alternative evidentiary basis for the amount of lost revenue sought. Mr. Wolfe testified during his deposition that the amount of lost revenue and reputational damages Plaintiffs seek is based on his "personal opinion" that the Underlying Action "tarnished Crossfield's reputation." (Doc. 81-81 at 6, 43.) Even though Plaintiffs' evidence in support of their lost wages and lost revenue appears questionable, the court does not weigh the evidence on summary judgment. *See Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury.") (internal quotation marks omitted) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)). This applies with equal force to Plaintiffs' testimony that their reputations have suffered as a result of the Underlying Action.

Plaintiffs further demand a sum certain in legal fees they claim they incurred in defending against the Underlying Action. On or around April 9, 2019, Plaintiffs sought reimbursement for $230,508.12 in legal fees from Enochian's insurer, AIG Insurance Co., which ultimately paid for or reimbursed $209,484.92 of Plaintiffs' legal fees for the Underlying Action. Plaintiffs claim to not have been reimbursed for $19,207.93 in legal fees. Defendants argue that Vermont's collateral source rule does not allow Plaintiffs to recover these funds as damages.

"The collateral-source rule operates 'to deny to a defendant a setoff for payment the plaintiff receives from a third, or collateral, source.'" *Windsor Sch. Dist. v. State*, 2008 VT 27, ¶ 32, 183 Vt. 452, 470-71, 956 A.2d 528, 542 (quoting *Hall v. Miller*, 465 A.2d 222, 225 (Vt. 1983)). "Most commonly applied where an insurance company has made a payment to compensate the plaintiff for his or her injuries, the collateral-source rule prevents the defendant wrongdoer from benefiting from the plaintiff's foresight in acquiring the insurance through any offsetting procedure." *Id.* (alteration adopted) (internal quotation marks omitted). "While the rule may result in plaintiff's obtaining a 'double recovery,' its essential purpose is not to provide the plaintiff a windfall but to

40

prevent the wrongdoer from escaping liability for his or her misconduct." *Id.* ¶ 32, 183 Vt. at 471, 956 A.2d at 542 (internal citation omitted).

Defendants contend that because AIG is Enochian's insurer, it is not "wholly independent" from Defendants and therefore allowing Plaintiffs to recover their legal fees would be an impermissible double recovery. *See* Doc. 106 at 2 (quoting *Bisson v. Reppel*, 2015 WL 631386, at *12 (D. Vt. Feb. 12, 2015)). Plaintiffs counter that Mr. Wolfe "was a first-party insured under the [directors and officers ("D&O")] policy by virtue of his CFO position with Enochian" and thus entitled to recover under the rule, because "the policy was for Mr. Wolfe's benefit as part of this employment, and [his] employment was consideration for the benefit received." (Doc. 107 at 3.)

Plaintiffs compare the AIG reimbursement payments to employer health insurance benefits and argue that the character of the payments is dispositive. They distinguish the payments' purpose for "legal defense expenses" for Mr. Wolfe's benefit as an insured under the D&O policy from "indemnity payments" made on Defendants' behalf as tortfeasors. *Id.* (citing Restatement (Second) of Torts § 920A (1979)); *see also* Restatement (Second) § 920A ("A payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited against his tort liability, as are payments made by another who is, or believes he is, subject to the same tort liability."). They cite the Second Circuit's observation that "[t]he mere fact that the employer-tortfeasor has contributed money (by payment of premiums, contributions, etc.) to the fund from which the benefits derive does not establish that such fund may not be a collateral source[.]" *Blake v. Delaware & Hudson Ry. Co.*, 484 F.2d 204, 206 (2d Cir. 1973) (citing *Hall v. Minnesota Transfer Ry. Co.*, 322 F. Supp. 92, 95 (D. Minn. 1971)); *see also King v. City of New York*, 2007 WL 1711769, at *1 (S.D.N.Y. June 13, 2007) (noting, in a negligence case arising out of a federal statute, that "[c]ollateral sources include income from personal insurance coverage as well as employee benefits").

Although the Vermont Supreme Court has not considered the applicability of the collateral source rule to D&O policy benefits for an employee suing an alleged employer-tortfeasor, it has "clearly stated that services provided without charge to the

41

plaintiff remain subject to the collateral source rule." *Gabree v. Beauregard*, 2005 WL 6369943 (Vt. Super. Dec. 9, 2005). It is thus not dispositive that Plaintiffs did not directly pay for the D&O policy benefits or that Plaintiffs may receive a double recovery.

Although Defendants are connected to AIG due to their payments of the D&O insurance premiums, Defendants' payments may be characterized as either where "the employer-tortfeasor makes payment directly or indirectly into a fund established for an independent reason" or "where such payment by the employer should be considered in the nature of fringe benefit or deferred compensation[.]" *Blake*, 484 F.2d at 207. As in that situation, "the employer should not be entitled to benefit by setting off such income in mitigation of his responsibility as a tortfeasor." *Id.*

If Defendants are not entitled to a setoff due to AIG's payment of Plaintiffs' legal fees, then Plaintiffs have a claim for a "reasonabl[y] certain[]" amount of damages incurred due to the Underlying Action. *Gettis*, 2005 VT 117, ¶ 33, 179 Vt. at 129, 892 A.2d at 172 (internal quotation marks omitted). Because the court cannot determine as a matter of law whether Plaintiffs' claimed damages are "as a result of the prior proceeding[,]" *Chittenden Tr. Co.*, 507 A.2d at 969, Defendants are not entitled to summary judgment on the basis of a lack of damages.

## CONCLUSION

For the foregoing reasons, Defendants' motion to exclude the opinions of Plaintiffs' expert witness (Doc. 82) is GRANTED IN PART and DENIED IN PART. Defendants' motion for summary judgment (Doc. 81) is DENIED.
SO ORDERED.

Dated at Burlington, in the District of Vermont, this 24th day of August, 2023.

Christina Reiss, District Judge
United States District Court